**EXXON CORPORATION, Appellant,**

v.

**The UNITED STATES, Appellee.**

**Appeal No. 85-2160.**

United States Court of Appeals, Federal Circuit.

Jan. 15, 1986.

Robert L. Moore, II, of Miller & Chevalier, Washington, D.C., argued for appellant. Of counsel were Jennings T. Smith, Exxon Corp., New York City, John B. Magee, Thomas D. Johnston and J. Bradford Anwyll, of Miller & Chevalier, Washington, D.C.

Theodore D. Peyser, Dept. of Justice, Tax Div., Washington, D.C., argued for appellee. With him on brief were Glenn L. Archer, Jr., Asst. Atty. Gen., Michael L. Paup and Jonathan S. Cohen.

Before MARKEY, Chief Judge, DAVIS, and BISSELL, Circuit Judges.

BISSELL, Circuit Judge.

Exxon Corporation (Exxon) appeals from a partial judgment dismissing its tax refund claim based upon a disallowance by the Commissioner of Internal Revenue Service of a bad debt deduction. We reverse the decision of the United States Claims Court reported at 7 Cl.Ct. 347 (1985).

## BACKGROUND

This litigation involves a claim to a bad debt deduction based entirely on transactions within the multinational operations of Exxon [formerly Standard Oil Company (New Jersey) and referred to herein as Standard]. The facts are fully set forth in the Claims Court opinion and they are summarized here.

Esso Standard Oil S.A. (Essosa) was a wholly owned Panamanian subsidiary of Standard, formed in 1951 to take over Standard's operations in the Caribbean basin and headquartered in Havana, Cuba. In early 1960, Essosa operated 18 divisions, including one located in Cuba.

Esso Export Corporation (Export), a domestic subsidiary of Standard, coordinated the purchase by Standard affiliates and others of crude oil and petroleum products produced by Standard's affiliates and assumed the risk of collection. The Cuban division's open account balance to Export fluctuated widely. As of December 31, 1958, it was $9.5 million; as of August 6, 1960, it was $27,397,440.

A revolution occurred in Cuba in the late 1950's, culminating with the installation of a new government under Fidel Castro in January 1959. Following the Castro takeover, the Cuban division began to experience delays in obtaining the dollars necessary to pay Export.

In late 1959, Essosa decided to move its headquarters from Havana to Coral Gables, Florida. In part, the move was intended to avoid the imposition of a Cuban tax on its activities. It was also motivated by concern that the Cuban government might assert jurisdiction over all of Essosa's assets, in the event of an intervention or expropriation. This same concern also led Standard to decide in January 1960 to spin-off Essosa's non-Cuban assets. Shortly thereafter, Standard sought a ruling from the Internal Revenue Service seeking approval of its plan to segregate Essosa's non-Cuban assets and liabilities in a tax-free reorganization. The plan involved the creation of a new foreign corporation and the transfer by Essosa of these assets and liabilities in exchange for the stock, followed by a distribution of the stock to Standard. Standard also requested a ruling under Section 367 of the Internal Revenue Code of 1954 (26 U.S.C. § 367) to establish that the proposed transaction did not have tax avoidance as one of its principal purposes. On April 18, and June 16, 1960, the Internal Revenue Service issued favorable rulings.

On June 27, 1960, Essosa incorporated Essosa Ltd. in Nassau. On June 30, 1960, Essosa was reorganized, involving the transfer of the non-Cuban assets to Essosa Ltd. for its stock and the distribution of that stock to Standard. After the reorganization, Essosa retained only its Cuban assets which had a balance sheet net worth of approximately $28 million.

On August 6, 1960, the Cuban government expropriated the Cuban assets of Essosa. By the end of 1960, it was clear that there was no realistic prospect that expropriation bonds or other compensation would be forthcoming from the Cuban government. Thus, Essosa was insolvent and unable to satisfy its outstanding liabilities.

For 1960, Standard filed a timely consolidated federal income tax return which claimed two bad debt deductions and a worthless security deduction arising out of the expropriation of Essosa's Cuban assets. Export claimed a bad debt deduction under Section 166 of the Internal Revenue Code of 1954 for $27,397,440 owed to it by Essosa. Standard claimed a similar deduction for $9 million owed to it by Essosa, plus a worthless security deduction for $2,131,177.

In 1967, Standard filed a claim against the Cuban government, on behalf of itself and its subsidiaries, before the Foreign Claims Settlement Commission of the United States. The book values in the Cuban Division financial statements for June 30, 1960, were approved by the United States government. On October 13, 1969, the Commission awarded $71,611,003 on the claim as the fair value of the Cuban Division on June 30, 1960. This amount repre-

sented the adjusted book value for the net worth, plus the $36.4 million in liabilities due Standard and Export. No payment has ever been received in respect of this claim.

On audit, the Commissioner disallowed Export's bad debt deduction, but allowed Standard's bad debt and worthless security deductions. On January 26, 1973, taxpayer paid a deficiency and interest thereon, of which $14,773,128 in tax and $10,470,912 in assessed interest are attributable to the described disallowance. On January 24, 1975, taxpayer filed a timely claim for refund contesting this disallowance.

Exxon filed suit in the United States Court of Claims to recover federal income tax and assessed interest for the disallowance referred to above and other nonrelated tax claims. The parties settled all of the issues except for the disallowance of Export's bad debt deduction for $27,397,440 and whether Standard's bad debt and worthless security deductions should constitute offsets against Export's bad debt deduction. The bad debt issue and the offsets were the subject of a trial, at the close of which the trial judge ruled in favor of the government on the bad debt issue. Thereafter, the parties stipulated that the government was entitled to prevail on the offset as to Standard's worthless security deduction and that the court's ruling in favor of the government on Export's bad debt deduction made it unnecessary for the court to rule on the offset relating to Standard's bad debt deduction. On January 29, 1985, the trial judge issued a written opinion followed by the filing of a partial judgment under Claims Court Rule 54(b) dismissing the complaint as to Standard's bad debt deduction. This appeal followed.

## OPINION

The issue, as presented to this court by the parties, was whether a potential fraudulent conveyance claim precludes a bad debt deduction under Section 166 of the Internal Revenue Code of 1954. We do not address that issue in its universal sense. Instead, we hold that under the facts of this particular case, for purposes of section 166, there is no fraudulent conveyance claim as asserted by the government and the judgment of the Claims Court must be reversed.

Section 166 of the Internal Revenue Code of 1954 provides that "[t]here shall be allowed as a deduction any debt which becomes worthless within the taxable year." 26 U.S.C. § 166(a)(1) (1960). Treas.Reg. § 1.166–2 is as follows:

(a) *General rule.* In determining whether a debt is worthless in whole or in part the district director will consider all pertinent evidence, including the value of the collateral, if any, securing the debt and the financial condition of the debtor.

(b) *Legal action not required.* Where the surrounding circumstances indicate that a debt is worthless and uncollectible and that legal action to enforce payment would in all probability not result in the satisfaction of execution on a judgment, a showing of these facts will be sufficient evidence of the worthlessness of the debt for purposes of the deduction under section 166.

26 C.F.R. § 1.166–2(a), (b) (1960).

At trial, the government conceded that the debt owed Export by Essosa was both bona fide and uncollectible, but asserted that the debt was not "worthless" because Export had a fraudulent conveyance claim against Standard arising out of the reorganization of Essosa on June 30, 1960. The reorganization consisted of the spin-off of Essosa's non-Cuban assets into Essosa Ltd. and the contemporaneous distribution of the Essosa Ltd. stock to Standard. The fraudulent conveyance theory presupposed that Essosa was rendered insolvent on June 30, 1960, by the reorganization, because the fair market value of the Cuban Division assets, all of which were located in Cuba, was less than the amount of the Cuban Division's liabilities.

At trial, Exxon countered the government's argument (a) by contending the existence of a cause of action against Standard under a fraudulent conveyance theory

does not impart value to an otherwise uncollectible debt, and (b) by introducing evidence to support the proposition that there was no fraudulent conveyance because the reorganization did not render Essosa insolvent.

The trial court held that:

Under plaintiff's theory, in determining whether a debt is worthless for purposes of Internal Revenue Code section 166, the court may consider only the possibility of recovery in an action brought directly on the debt and must ignore any possible recovery in a collateral action such as under a theory of fraudulent conveyance. Plaintiff's argument is supported by neither the language nor the logic of the statute.

7 Cl.Ct. at 356. It further held that in a fraudulent conveyance action by Export against Standard that "there was a reasonable prospect that plaintiff would have recovered the amounts owed." 7 Cl.Ct. at 355.

The problem with this case is that we are dealing with related parties, some of whom filed consolidated tax returns—Standard and Export—and Essosa which filed, if at all, separately. Generally, for purposes of the Internal Revenue Code, affiliated corporations who file separate returns are separate taxpayers. *See Wagner Electric Corp. v. United States*, 529 F.2d 533, 208 Ct.Cl. 1024 (1976); *Textron, Inc. v. United States*, 561 F.2d 1023, 1026 (1st Cir. 1977) (parent allowed a section 166 bad debt deduction for subsidiary's worthless open accounts). Those who file consolidated returns are "treated as a single entity for income tax purposes as if they were, in fact, one corporation." *American Standard, Inc. v. United States*, 602 F.2d 256, 261 (Ct.Cl.1979). It is true that "[w]here the debt transaction is between affiliated corporations, as in the instant case, all the facts must be carefully scrutinized to see whether the loss has economic reality or is the result of the shuffling of funds or assets between related entities." *Canaveral Int'l Corp.*, 61 T.C. 520, 543–44 (1974); *see also C.M. Gooch Lumber Sales Co.*, 49

T.C. 649, 656 (1968); *American Processing and Sales Co. v. United States*, 371 F.2d 842, 852 (Ct.Cl.1967).

Based upon the foregoing, Standard and Export are treated as one entity and Essosa is a separate entity for tax purposes. Since a creditor cannot bring a fraudulent conveyance action against himself, it then must be determined whether this loss has economic reality or whether it is a mere shuffling of assets. The government asserts the latter in their fraudulent conveyance argument. When approached on the basis of economic reality, the facts of this case parallel those of *United States v. White Dental Co.*, 274 U.S. 398, 47 S.Ct. 598, 71 L.Ed. 1120 (1927), a tax refund case on certiorari to the Court of Claims.

Just as Standard owned a subsidiary with its assets in Cuba, so White Dental owned a subsidiary in Germany. Just as the Cuban government expropriated the assets of Standard's subsidiary, so the German government seized the entire property of White Dental's subsidiary. Standard claimed an income tax deduction relating to the expropriated assets which was disallowed by the Internal Revenue Service, and later filed with the Foreign Claims Settlement Commission a claim against the Cuban government. White Dental claimed an income tax deduction relating to the seized property which was disallowed by the Internal Revenue Service, and later filed with the Mixed Claims Commission a claim against the German government.

In *White Dental*, the sole question presented was "the right of the [taxpayer corporation] to deduct from its gross income for 1918, the amount of its investment [represented by both the capital stock and an open account] in a subsidiary German corporation whose entire property was seized in that year by the German government as enemy property." *Id.* at 399, 47 S.Ct. at 599. The total deduction was "conceded to be no more than the fair value of the net assets of the German corporation." *Id.*

In allowing the deduction, the Supreme Court quoted a provision of the Treasury

Regulations, a predecessor of Treas.Reg. § 1.166–2, and then discussed the application of the statute and the regulations to the facts of the case:

> Article 151 provides in part: "Where all the surrounding and attendant circumstances indicate that a debt is worthless and uncollectible and that legal action to enforce payment would in all probability not result in the satisfaction of execution on a judgment, a showing of these facts will be sufficient evidence of the worthlessness of the debt for the purpose of deduction." ...

> The case turns upon the question whether the loss, concededly sustained by the respondent through the seizure of the assets of the German company in 1918, was so evidenced by a closed transaction within the meaning of the quoted statute and treasury regulations as to authorize its deduction from gross income of that year. The statute obviously does not contemplate and the regulations (Art. 144) forbid the deduction of losses resulting from the mere fluctuation in value of property owned by the taxpayer. *New York Ins. Co. v. Edwards,* 271 U.S. 109, 116 [46 S.Ct. 436, 437, 70 L.Ed. 859 (1926)]; cf. *Miles v. Safe Deposit Co.,* 259 U.S. 247 [42 S.Ct. 483, 66 L.Ed. 923]. But with equal certainty they do contemplate the deduction from gross income of losses, which are fixed by identifiable events, such as the sale of property (Art. 141, 144), or, caused by its destruction or physical injury (Art. 141, 142, 143) or, in the case of debts, by the occurrence of such events as prevent their collection (Art. 151).

> The transaction evidencing the loss here was the seizure of the property of the German company. The loss resulted to the respondent because it was a creditor and stockholder of that company which, as a result of the sequestration, was left without property or assets of any kind.

. . . .

> That legal action by respondent upon its open accounts against a corporation thus despoiled would have been fruitless within the meaning of Art. 151 seems not open to question. . . .

> *If the seized assets are viewed as the property of respondent, ignoring the entity of the German company, the result is the same.* The quoted regulations, consistently with the statute, contemplate that a loss may become complete enough for deduction without the taxpayer's establishing that there is no possibility of an eventual recoupment. . . .

> ... *It is enough to justify the deduction here that the transaction causing the loss was completed when the seizure was made.*

*Id.* at 401–403, 47 S.Ct. at 599–600 (emphasis added).

In effect, what we have in this case is an open account owed by an expropriated foreign company to a United States entity. The government has conceded that it is a valid debt and that as of the end of 1960 that debt was uncollectible. We conclude it is also worthless. The United States entity has suffered a real economic loss of over $71 million. The government's argument—that a potential fraudulent conveyance action by one member of an entity against another member is available to thwart the basic purpose* behind allowing corporations to file consolidated tax returns—is unavailing. Export is entitled to its bad debt deduction for $27,397,440. Therefore, the judgment of the Claims Court is reversed and remanded for entry of judgment in accordance herewith.

**REVERSED AND REMANDED.**

---

* "The basic purpose behind allowing corporations to file consolidated returns is to permit affiliated corporations, which may be separately incorporated for various business reasons, to be treated as a single entity for income tax purposes as if they were, in fact, one corporation." *American Standard, Inc. v. United States,* 602 F.2d 256 (Ct.Cl.1979).