**EXXON CORPORATION, Plaintiff,**

**v.**

**The UNITED STATES, Defendant.**

**No. 235–79T.**

United States Claims Court.

June 8, 1987.

Robert L. Moore, II, Washington, D.C., for plaintiff. John B. Magee, Thomas B. Johnston, and J. Bradford Anwyll, Washington, D.C., of counsel. Jennings T. Smith, New York City, of counsel.

Theodore D. Peyser, Jr., with whom were Asst. Atty. Gen. Roger M. Olsen, and Mildred M. Seidman, Washington, D.C., for defendant.

## OPINION

SMITH, Chief Judge.

This case returns to this court following the reversal and remand of former Chief Judge Kozinski's decision by the Court of Appeals for the Federal Circuit. That decision disallowed plaintiff's claim for a bad debt deduction of $27,397,440. In order to determine whether further proceedings were necessary to resolve this case or whether judgment should simply be entered in favor of plaintiff, each side was requested to file a memorandum.

Plaintiff contends that it should be awarded its bad debt deduction claim and various other settled claims without further proceedings. The government contends that no such award should be given until two of its offsets are first resolved. For the reasons given, the court finds the plaintiff's position supported by both the letter and the logic of the Court of Appeals' decision.

### Facts

The original dispute between Exxon (formerly Standard Oil Company of New Jersey) and the Internal Revenue Service (the

"IRS") entailed a refund claim on some 23 issues covering the taxable years from 1955 through 1965 and 1967. Stipulation for Partial Dismissal with prejudice was reached on the taxpayer's relief claims for taxable years 1955 through 1959 and 1961 through 1965 and 1967.

As for 1960, agreement was reached on all matters except the taxpayer's claim of $27,631,177 for a bad debt deduction and for the government's two offsets of $11,631,177. The offsets were based on the government's contention that it had erroneously allowed deductions for worthless stock and bad debt in the same year.

The factual issues at the heart of this dispute involve Standard Oil's transactions with its multinational subsidiaries. Specifically, all of the losses relate to the seizure of a wholly owned subsidiary called Esso Standard Oil S.A. (Essosa). The Essosa subsidiary was a Panamanian corporation with a refinery and headquarters located in Cuba. It also had 18 independent divisions located in other parts of the Carribbean. Essosa was operating profitably until the communist regime of Fidel Castro came to power. From that point onward, the company, along with the rest of the oil corporations in Cuba, began experiencing problems due to rapidly increasing economic restrictions.

In order to prevent the regime from expropriating or from imposing control over Essosa's operations outside of Cuba, Essosa began planning an I.R.C. § 368(a)(1)(D) reorganization, which qualified under I.R.C. § 355. The result of this plan would enable Essosa to spin off its non-Cuban assets from its Cuban operations. After rulings were requested by the taxpayer, the IRS determined that the transfer was not done for the principal purpose of avoiding tax and that the reorganization was qualified to be tax free.

The plan was effectuated on June 30, 1960, and entailed three basic transactions. First, Esso Standard Oil S.A., Ltd., was created with a headquarters located in Nassau, Florida. Second, Essosa transferred its non-Cuban assets to the newly created corporation in exchange for the newly cre-ated stock. Third, the stock of this new corporation was then transferred to Essosa's parent, Standard Oil of New Jersey. The end result of these transactions was to leave Essosa with a balance sheet net worth of approximately $28 million and a stock basis of $2,131,177.

On July 1, 1960, a day after the spin-off was complete, the Cuban government intervened against all of Essosa's remaining assets citing as the reason that Essosa refused to refine oil from the Soviet Union. On August 6, these assets were officially seized.

When the Cuban government intervention against all of Essosa's assets occurred, Essosa owed $9,000,000 to its parent Standard Oil (presently Exxon) for financing the Cuban refinery. Essosa also owed $27,397,440 for crude oil received on its open account with Esso Export Corporation (Export), another subsidiary of Standard Oil.

In a 1960 consolidated return with Export, Standard Oil claimed bad debt losses for both the $9,000,000 and the $27,397,440 debts outstanding. Standard Oil also claimed a worthless stock deduction of $2,131,177 (an amount equal to Standard Oil's basis in the stock). All of these claims related to the fact that Essosa had no assets left. For without any assets, Essosa could not realistically repay its debts nor could it be said that its stock had any value.

The $27,397,440 bad debt deduction charged off by Export was disallowed on audit. The taxpayer chose to pay the deficiency and sued for a refund in 1975.

During the same audit which disallowed the Export bad debt deduction, the IRS raised no objection to Standard Oil's charge offs of bad debt and worthless stock. In the taxpayer's suit however, the IRS alleged that its earlier allowance of such charges was erroneous and proceeded to challenge these deductions by way of offset.

Besides charging off the loss on its tax returns, Standard Oil filed a claim against Cuba before the Foreign Claims Settlement

Commission of the United States in 1967. The commission held that the Cuban assets were illegitimately seized and found that Standard Oil was entitled to $71,611,003 as compensation. The $71,611,003 was said to be representative of the fair market value of the Cuban division on June 30, 1960, the day of the subsidiary's reorganization but a day before its seizure. This fair market value was based upon Essosa's adjusted book value for its net worth and its liabilities owed to Standard Oil and Export. Despite the above findings by the Foreign Claims Settlement Commission, the Cuban government has never made any attempt to pay the claim.

In the course of the original proceedings before this court, settlement could not be reached on the issue of Export's bad debt deduction. Both parties were also not able to reach settlement with respect to the government's offsets for Standard Oil's deductions of bad debt and worthless stock.

At trial, the government argued that Export's deduction should be denied on two grounds. First, the government asserted that the I.R.C. § 368(a)(1)(D) reorganization rendered Essosa worthless, and therefore Export's debt had not gone bad because it probably could have been recovered by legal action under a theory for fraudulent conveyance. *See* Treas.Reg. § 1.166–2(b) (1960). Second, the government argued that the I.R.C. § 368(a)(1)(D) reorganizational distribution of stock to Standard Oil amounted to a constructive repayment of Export's debt.

Chief Judge Kozinski's opinion only decided the issue of possible legal recovery and never addressed the issue of constructive repayment. It found "that, as of June 30, 1960, an arms length, knowledgeable investor would have been unwilling to pay more than a nominal sum for Essosa's assets.... Essosa was therefore left insolvent after the reorganization." *Exxon Corp. v. United States*, 7 Cl.Ct. 347, 354 (1985) *rev'd*, 785 F.2d 277 (Fed.Cir.1986). Such a debt "would not have [been] lightly abandoned." *Id.* at 355. An arms length debtor would have brought a fraudulent conveyance action and "[w]hile such a suit

would have had a number of hurdles to overcome, the probability of success would have likely ... [been] in the range of 50–60%." *Id.* Thus, Export's debt had not become worthless since it probably could have been recovered by legal action. Treas.Reg. § 1.166–2(b).

Accordingly, a partial judgment dismissing Export's $27,397,440 bad debt claim was issued. See generally RUSCC 54(b). Both parties then stipulated that the government was entitled to prevail on its worthless stock offset on the basis of Chief Judge Kozinski's opinion. Because the worthless stock offset stipulation completely eliminated the taxpayer's remaining refunds claimed for the year at issue, both parties stipulated that it was unnecessary to rule on the offset relating to Standard's $9,000,000 bad debt.

Shortly thereafter, the taxpayer appealed the court's grant of partial summary judgment to the Court of Appeals for the Federal Circuit. The appeal resulted in a reversal and remand. A petition for rehearing by the government followed and was denied without comment. In both the appeal and its petition for rehearing, the government took the position that the Claims Court's decision on its fraudulent conveyance theory was correct. The government also unsuccessfully argued its constructive payment theory in the alternative.

Both parties agree that the appellate opinion resulted in a victory for the taxpayer on the issue of Export's bad debt deduction. However, the parties do not agree on the opinion's meaning and breadth as to the government's claimed offsets.

### Discussion

■ The taxpayer initially contends that the language of Court of Appeals' opinion directly disposed of these claims. This is allegedly so because the opinion explicitly stated that the taxpayer "is entitled to its bad debt deduction for $27,396,440." 785 F.2d 277, 281 (Fed.Cir.1986). The court therefore reversed and remanded for entry of judgment in accordance therewith but made no mention of the offsets. An omission which is said to be all the more strik-

ing in view of the fact that the offsets were raised both in the initial appeal and again in the government's petition for rehearing.

Plaintiff's interpretation of the Court of Appeals' opinion is substantially correct but misses the point. Appellate consideration of an issue from the Claims Court can only occur after the Claims Court has rendered a final decision. *See* 28 U.S.C. § 1295 (1982) ("The United States Court of Appeals for Federal Circuit shall have exclusive jurisdiction of an appeal from a final decision of the United States Claims Court.") In this case, the Claims Court entered a final decision only with respect to the Export bad debt deduction. *See* RUSCC 54(b). No final adjudication was entered on either of the two governmental offsets; both of which were resolved by stipulation instead. Therefore, the Court of Appeals could not have ruled on these offsets because it lacked the jurisdiction to do so.

### Law of the Case Doctrine

■ Although the Court of Appeals did not directly review the government's offset claim, its opinion cannot be disregarded when these issues return to this court upon remand. *See Stewart-Warner Corp. v. City of Pontiac, Michigan,* 767 F.2d 1563, 1567 (Fed.Cir.1985) ("The mandate of the Sixth Circuit is binding upon the district court.") Rather, as a result of the law of the case doctrine, this court's determinations on remand are bound both by the Court of Appeals' conclusions of law and by its findings of fact. *Wheeler v. City of Pleasant Grove,* 746 F.2d 1437, 1440 (11th Cir.1984) (per curiam) (quoting *United States v. Robinson,* 690 F.2d 869 (11th Cir.1982)). The appellate court's mandate must be applied in letter and spirit; *e.g., Bankers Trust Co. v. Bethlehem Steel Corp.,* 761 F.2d 943 (3rd Cir.1985), and therefore it resolves all issues before this court which were decided expressly or by necessary implication. *Accord e.g., Piambino v. Bailey,* 757 F.2d 1112, 1120 (11th Cir.1985), *cert. den.,* —— U.S. ——, 106 S.Ct. 2889, 90 L.Ed.2d 976; *Fogel v. Chestnutt,* 668 F.2d 100, 108 (2d Cir.1981).

The basic rationale behind this rule is to prevent the wasteful use of judicial resources since at some point

litigation should come to an end. It is predicated on the premise that "there would be no end to a suit if every obstinate litigant could, by repeated appeals, compel a court to listen to criticisms on their opinions or speculate of chances from changes in its members", and that it would be impossible for an appellate court "to perform its duties satisfactorily and efficiently" and expeditiously "if a question, once considered and decided by it were to be litigated anew in the same case upon any and every subsequent appeal" thereof.

*Paul v. United States,* 734 F.2d 1064, 1065–66 (5th Cir.1984) (quoting *White v. Murtha,* 377 F.2d 428, 431–32 (5th Cir. 1967)). While in this matter the government has not been "an obstinate litigant" nor has it raised frivolous issues, it is clear to this court that the Court of Appeals has positively decided the questions which the government seeks to raise here.

### Worthless Stock Offset

■ In order to determine the validity of the government's offset against the taxpayer's claimed deduction of worthless Essosa stock, this court must ascertain the date on which Essosa's insolvency occurred. Standard's worthless stock deduction was valid if Essosa's insolvency occurred on July 1, 1960. July 1, 1960, was the date of the Cuban seizure and the stock's worthlessness would therefore be considered as a result flowing therefrom. Conversely, the worthless stock deduction was invalid if the insolvency occurred on or before June 30. June 30 was the date of Esossa's reorganization and therefore the basis in the Essosa stock would not be considered lost but merely transferred to the newly formed Esso Standard Oil S.A., Ltd. Corporation.

The government argues that this court should comply with its prior decision, which held that the insolvency resulted from the

reorganization and not from the seizure. It then argues that the law of the case doctrine does not apply here for the Claims Court's finding of insolvency was not disturbed on appeal. The government's argument is unpersuasive. When applying the law of the case doctrine, "it is appropriate, indeed often necessary, to look to the court of appeal's opinion," *Wheeler* at 1440, and this is exactly what the government's argument fails to do.

According to our appellate court, the central issue involved was whether "the loss ha[d] economic reality or [wa]s the result of the shuffling of funds or assets between related entities." *Exxon v. United States,* 785 F.2d 277, 280 (Fed.Cir.1986) *rev'g,* 7 Cl.Ct. 347 (1985). The Court of Appeals ultimately found in clear terms that the taxpayer did indeed "suffer[ ] a real economic loss of over $71 million." 785 F.2d at 281. This $71 million figure was based on the Foreign Claims Settlement Commission's award which was said equal to "the fair value of the Cuban Division on June 30, 1960[,]" the day before the seizure. Under the Court of Appeal's mandate, this court is compelled to deny the worthless stock offset since the insolvency was found to be caused by the seizure and not the reorganization.

**The Stipulation**

█ The government alternatively contends that its worthless stock offset should still stand because "the parties stipulated that the government was entitled to prevail" on the issue. Additional Joint Stipulations (No. 235–79T). Stipulations however are not binding in all circumstances. They can be disregarded where substantial evidence to the contrary is found on the record. *E.g., Smith v. Blackburn,* 785 F.2d 545, 549 (5th Cir.1986); *Loftin and Woodward, Inc., K.C. v. The United States,* 577 F.2d 1206, 1232–33 (5th Cir. 1978).

On the basis of the Court of Appeals' opinion, this court holds that such evidence exists. The stipulation was based on this court's prior opinion concluding that Esso-

sa was rendered insolvent by its reorganization rather than by the Cuban seizure. The Court of Appeals however found substantial evidence in the trial record to the contrary. Thus, in view of the above, this court will waive the stipulation and deny the government's offset claim.

**Standard Oil's Bad Debt Offset**

█ In addition to requesting further proceedings on its worthless stock offset, the government is urging further proceedings on its offset relating to Standard Oil's $9,000,000 charge off for its worthless loan to Essosa. The government's rationale for denying the charge off is that the reorganizational distribution of Esso Standard, S.A., Ltd., stock should be considered a constructive payment on the debt.

The taxpayer urges this court to reject this constructive payment theory because of the appellate court's law of the case. The government conversely argues that the law of the case doctrine has no application because this theory was not mentioned either by the Court of Appeals opinion nor by the Claims Court opinion.

Yet, the government has failed to point out that the constructive payment argument had been raised in the alternative. It was contested at trial but not addressed by Chief Judge Kozinski's opinion because the government prevailed on other grounds. Although the Court of Appeals opinion did not discuss the issue, it was validly contested on appeal and in the government's petition for rehearing. *See e.g., Dandridge v. Williams,* 397 U.S. 471, 475 n. 6, 90 S.Ct. 1153, 1156 n. 6, 25 L.Ed.2d 491 (1970) ("The prevailing party may, of course, assert in a reviewing court any ground in support of this judgment, whether or not that ground was relied upon or even considered by the trial court."); *United States v. American Ry. Express. Co.,* 265 U.S. 425, 435, 44 S.Ct. 560, 563, 68 L.Ed. 1087 (1924) ("[T]he appellee may ... urge ... any matter appearing in the record, although his argument may involve an attack upon the reasoning of the lower court or an insistence upon matter overlooked or ignored by it.")

Therefore, in denying the government's claim, the Federal Circuit implicitly rejected the government's alternative constructive payment argument against the taxpayer's Export bad debt deduction. *Compare Trahan v. First Nat. Bank of Ruston,* 747 F.2d 990, 991 (5th Cir.1984) (per curiam) (law of the case applied where similar argument was made to the Appellate Court in a petition for rehearing and that petition was denied without comment) *with Holcomb v. United States,* 622 F.2d 937, 940 (7th Cir. 1980) (law of the case doctrine did not apply to arguments not presented before the court). The question becomes whether the law of the case doctrine precludes the government from also asserting its constructive payment theory against the bad debt deduction of Standard Oil.

The facts involved in both constructive payment arguments are identical. The only point of difference between the two claims is that the stock was distributed to Standard Oil rather than to Export. This difference however is not significant. Both affiliated corporations filed a consolidated return and are thus to be "treated as a single entity for income tax purposes as if they were, in fact, one corporation." *Exxon v. United States,* 785 F.2d at 280 (citing *American Standard, Inc. v. United States,* 602 F.2d 256, 261 (Ct.Cl.1979). Accordingly, the law of the case doctrine compels this court to dismiss the government's offset against Standard Oil's bad debt charge off.

### Conclusion

In light of the Court of Appeals opinion rendered in *Exxon v. United States,* 785 F.2d at 277, this court finds no reason for further proceedings in this matter. The Court of Appeals' decision fully disposed of all issues that are relevant to a final resolution of this matter. Based on the foregoing, IT IS SO ORDERED:

1. The taxpayer is entitled to its entire bad debt deduction for $27,397,440.

2. Pursuant to the stipulation as to amount filed on May 28, 1987, plaintiff is awarded $25,321,066 in tax and interest paid by it for the taxable year of 1960, plus interest on this judgment according to law.