**EXXON CORPORATION, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 235–79T.**

United States Claims Court.

March 7, 1990.

Amended March 14, 1990.

Robert L. Moore, II, Washington, D.C., for plaintiff. Jennings T. Smith, Exxon Corp., New York City, of counsel. John B. Magee, Thomas D. Johnston, and J. Bradford Anwyll, Washington, D.C., of counsel.

Mildred L. Seidman, with whom were Jonathan S. Cohen and James I. Knapp, Acting Asst. Atty. Gen., Tax Div., U.S. Dept. of Justice, Washington, D.C., for defendant.

## OPINION

SMITH, Chief Judge.

This case, involving the propriety of certain federal corporate tax deductions claimed by the Exxon Corporation, comes before the court for a third time. The validity of Exxon's $27.4 million deduction for an uncollectible debt owed to an Exxon subsidiary has already been established in prior proceedings. Only the government's two offset claims—one for an allegedly improper $9 million bad debt deduction, the other for an allegedly improper $2.13 million worthless securities deduction—remain for disposition by the court. For the reasons set forth below, the government's offset claim for the $9 million bad debt deduction is denied. The government's worthless securities offset claim is allowed in part.

## FACTS

The factual background of this case has already been discussed in detail in four reported decisions. *Exxon Corp. v. United States*, 7 Cl.Ct. 347 (1985), *reversed*, 785 F.2d 277 (Fed.Cir.1986), *on remand*, 12 Cl.Ct. 434 (1987), *vacated*, 840 F.2d 916 (Fed.Cir.1988). Thus, the court will recount here only those facts relevant to the government's two offset claims.

The transactions at issue grew out of the Standard Oil Company's multinational operations in the late 1950s and early 1960s.[1] Standard Oil, which was headquartered in New Jersey, conducted worldwide distribution and refining of petroleum products through a network of subsidiaries. Esso Standard Oil S.A. (Essosa), a Panamanian corporation and a wholly-owned subsidiary of Standard Oil, was headquartered in Havana, Cuba, and handled refining and marketing of petroleum products for 18 Caribbean countries through 18 divisions. Essosa's Cuban division was its largest and the only one with a refinery.

Esso Export Corporation (Esso Export), another wholly-owned Standard subsidiary, provided Essosa with crude oil and other supplies. In a typical transaction, Esso Export would arrange for crude oil to be shipped from Creole Petroleum Corporation, a Standard subsidiary producing crude oil in Venezuela, to Essosa's Cuban division. Creole would invoice Essosa for the crude oil, and then assign its invoice to Esso Export; Esso Export would pay Creole immediately, and collect the invoice amount from Essosa, usually within 30 days. Essosa was required to pay Esso Export in United States dollars.

---

1. The Standard Oil Company changed its name to Exxon Corporation on November 1, 1972.

In 1957, Standard Oil lent Essosa $9 million to finance an expansion of Essosa's refinery. The loan was due in 1968, and provided for interest at an annual rate of 4%, payable each June 30 and December 31. Payments were to be made in United States dollars at Standard Oil's office in New York City. Essosa was free to repay all or part of the loan prior to 1968.

On January 1, 1959, Fidel Castro seized power in Cuba, ousting the government of Fulgencio Batista. Soon thereafter, Castro began to impose currency exchange restrictions. Those importing goods to Cuba were required to obtain the approval of the Cuban Monetary Stabilization Fund before paying their suppliers in United States dollars. Due to frequent delays in obtaining such approval, Essosa's Cuban division became unable to pay Esso Export in a timely fashion. By June of 1960, Essosa's Cuban division owed approximately $27.4 million to Esso Export.

Standard Oil officials grew increasingly concerned throughout 1959 that the Castro government might impose more onerous restrictions on Essosa's activities. Thus, in January, 1960, Essosa's headquarters were relocated to Coral Gables, Florida. Standard Oil officials also began to devise a plan to transfer all of Essosa's non-Cuban assets to a company having no nexus with Cuba. Standard Oil sought and obtained a ruling from the Internal Revenue Service that the proposed reorganization would qualify as a tax-free reorganization under Internal Revenue Code § 355. On June 30, 1960, Essosa transferred all of its non-Cuban assets and liabilities to a newly-formed Bahamas corporation, Esso Standard Oil, S.A. Ltd. (Essosa Ltd.). In exchange, Essosa received all of the stock of Essosa Ltd., which it distributed to its parent, Standard Oil, on June 30, effectively separating the ownership of Essosa's Cuban division from its other divisions. Prior to the reorganization, Standard had a $7.6 million basis in the stock of Essosa. Following the reorganization, Standard allocated $2.13 million of this basis to the stock of Essosa, and the remaining $5.5 million basis to the stock of the newly-formed Essosa Ltd.

Meanwhile, in February, 1960, Cuba and the Soviet Union entered into a trade agreement, providing for the importation of Soviet goods, including crude oil, into Cuba on a barter basis. In May, 1960, the Cuban government requested that Essosa's Cuban division, as well as the Cuban refineries of Shell and Texaco, process Soviet crude oil. Essosa expressed a willingness to refine the Soviet oil. However, United States Treasury Secretary Robert B. Anderson asked Shell, Texaco, and Essosa to refuse to accept delivery of the Soviet oil, saying that such a refusal would be in the best interest of the United States. On July 1, 1960, Cuban officials delivered Soviet crude oil to Essosa's Cuban refinery. Essosa refused to refine the oil. As a result, the Cuban government "intervened" Essosa, i.e., it placed Essosa's refinery under government control, but allowed Essosa to retain title and ownership. On August 6, 1960, the Cuban government formally expropriated all of Essosa's assets.

Standard Oil filed a consolidated tax return with Esso Export for the year 1960. On the return, Standard claimed (i) a $27.4 million bad debt deduction with respect to the $27.4 million owed Esso Export by Essosa; (ii) a $9 million bad debt deduction for the $9 million owed Standard by Essosa on the 1957 loan; and (iii) a $2.13 million worthless securities deduction, representing Standard's basis in Essosa stock. The three deductions were based on the fact that Essosa had no assets left. On audit, the $27.4 million deduction was disallowed. The remaining two deductions were initially allowed. Exxon subsequently paid the tax on the $27.4 million, and later brought this refund suit.[2]

Former Chief Judge Kozinski held a trial in this matter in 1984. He heard the testimony of expert witnesses, who offered opinions as to the financial condition of Essosa's Cuban division prior to and imme-

2. The suit originally involved 23 issues, covering the tax years 1955 through 1965 and 1967. The parties reached agreement on all issues except for the $27.4 million bad debt deduction and the government's two offset claims.

diately following the June 30, 1960 reorganization, as well as following the Cuban government's intervention and subsequent expropriation of Essosa. Chief Judge Kozinski also heard the testimony of government officials, investors, and people who were doing business in Cuba in the late 1950s and early 1960s. This testimony focused on the effect that the events following Castro's rise to power had on investors' confidence that the Cuban government would stand behind its financial obligations. It also focused on the willingness of businessmen and the United States government to continue doing business with Cuba as the events of 1960 unfolded.

The government argued that the $27.4 million bad debt deduction should be denied on two grounds. First, the government asserted, the June 30, 1960 reorganization rendered Essosa worthless, and therefore Essosa's debt to Esso Export could have been recovered in a fraudulent conveyance action against Standard. Second, the government argued that the reorganizational distribution of Essosa Ltd. stock to Standard amounted to a constructive repayment of Essosa's debt to Export. In early 1985, Chief Judge Kozinski issued an opinion denying Exxon's claimed $27.4 million bad debt deduction, on the ground that although the debt was genuine, and although Esso Export had no prospect of recovering from Essosa, Esso Export had a reasonable chance of recovering the money owed in a fraudulent conveyance action against Standard. Thus, for purposes of Internal Revenue Code § 166, the debt was not worthless. *Exxon Corp. v. United States*, 7 Cl.Ct. 347 (1985). Chief Judge Kozinski issued a partial judgment dismissing Exxon's $27.4 million bad debt claim under RUSCC 54(b). As will be discussed later, a crucial issue in the present proceeding is the meaning and effect of Chief Judge Kozinski's opinion.

Upon Exxon's appeal, the Federal Circuit reversed, ruling that because Esso Export and Standard were treated as a single entity for federal income tax purposes, Esso Export had no fraudulent conveyance claim against its parent company Standard, and therefore, Exxon was entitled to the $27.4 million bad debt deduction. 785 F.2d 277 (Fed.Cir.1986) (*Exxon I*). The government's petition for rehearing was denied. In both the appeal and the petition for rehearing, the government took the position that Chief Judge Kozinski's conclusion regarding the fraudulent conveyance theory was correct. The government also advanced, unsuccessfully, its constructive repayment argument in the alternative. The case was remanded for entry of judgment in accordance with the Federal Circuit's opinion.

On remand, this court reached the government's two offset claims.[3] This court ruled that the Federal Circuit in *Exxon I* had implicitly overturned Chief Judge Kozinski's finding that Essosa was rendered insolvent by the June 30, 1960 reorganization, and had instead found that Essosa was rendered insolvent by the July 1, 1960 intervention of Essosa by the Cuban government. 12 Cl.Ct. 434, 439 (1987). This court went on to hold that under law of the case principles, it was bound by the Federal Circuit's findings as to the date of Essosa's insolvency, and therefore, the $2.13 million worthless securities deduction was properly taken. *Id.* Although the parties had stipulated that the government was entitled to prevail on its worthless securities offset claim, the court waived the stipulation in light of the fact that it was based on Chief Judge Kozinski's finding that Essosa had been rendered insolvent by the June 30 reorganization. *Id.* As to the $9 million bad debt deduction, this court ruled that the Federal Circuit in *Exxon I* had implicitly rejected the government's constructive payment argument with respect to the $27.4 million bad debt deduction, and since there was no basis to distinguish between the $9 million bad debt deduction and the $27.4 million bad debt de-

---

3. Chief Judge Kozinski did not address the two offset claims due to his conclusion that the $27.4 million deduction was not allowable. Under that ruling, there was no refund due Exxon for the tax year 1960, and therefore, there was nothing against which the government could exercise its claimed right of offset.

duction, the government's offset claim regarding the $9 million deduction had to be denied. 12 Cl.Ct. at 440. This court entered judgment in favor of Exxon on the $27.4 million bad debt deduction.

The government appealed the denial of its two offset claims. The Federal Circuit vacated this court's opinion, holding that this court erred in concluding that the law of the case doctrine compelled allowance of the $9 million bad debt and the $2.13 million worthless securities deductions. 840 F.2d 916 (Fed.Cir.1988) (*Exxon II*). Specifically, the Federal Circuit stated:

> In the previous appeal ... we concluded that Standard was entitled to the $27.4 million deduction. That is all we held. We did not address when Essosa became insolvent, nor whether Essosa's transfer to Standard of Essosa Ltd.'s stock amounted to payment of the $9 million loan. Our prior decision, therefore, does not compel the Claims Court's application of the law of the case doctrine.

840 F.2d at 917 (citation omitted). The Federal Circuit went on to say:

> [A] dispute exists concerning the value of the stock for which Standard claims a $2.1 million worthless stock deduction. The first Claims Court decision never addressed this issue, ... and the decision we are now reviewing did not permit the issue to go to trial because the court disposed of the question under the law of the case doctrine. However, it is clear that our earlier opinion never reached the question of the proper valuation for the worthless stock.

*Id.* (citation omitted). The case was remanded for further proceedings.

The parties have stipulated to having the two offset issues decided on the record as it was developed before Chief Judge Kozinski. The case was submitted following oral arguments on the parties' supplemental briefs.

## DISCUSSION

### I. The effect of Chief Judge Kozinski's findings.

█ The first issue to be addressed in disposing of the government's two offset claims is whether certain factual findings made by Chief Judge Kozinski—findings which were not disturbed in either appeal— are binding in this proceeding. The government argues that this court is bound to accept the finding that the June 30, 1960 reorganization rendered Essosa insolvent. All of the government's arguments relating to its two offset claims presuppose the correctness of this finding.

Analysis of the question of whether the court is bound by Chief Judge Kozinski's finding of insolvency in the present proceeding must begin with his opinion, pertinent portions of which are set out at length:

> Essosa's June 30, 1960 balance sheet showed Cuban Division assets of $76 million and liabilities of $48 million. At least on paper, then, Essosa was solvent. However, the balance sheets were based on the situation as it existed before Castro. The reorganization ... took place some 18 months after the Castro regime had come to power and dramatically changed the Cuban business climate. This change affected the confidence of investors and, consequently, the market value of Essosa's Cuban assets. The key factual question presented at trial was whether, at the time of the reorganization, the value of Essosa's Cuban assets was so affected by the political situation that they were worth less than its outstanding liabilities. Or, putting the question somewhat differently, the court was asked to determine whether an arms' length, informed investor would have been willing to pay a price that was more than nominal for the Belot refinery and Essosa's other Cuban assets, given that they were burdened with $48 million in liabilities.

> \*   \*   \*   \*   \*   \*

> The most persuasive evidence as to the attitude of investors toward the Cuban economic and political situation is the market for bonds issued by the Cuban government itself.... By June of 1960, the yield on Cuban bonds had risen [from 4.16%] to 9.88%, more than double the

rate of 18 months earlier.... This sharp rise in the yield of the Cuban bonds reflected a concomitant drop in the market price of the bonds, which were trading at $566. This was a discount of more than 43% from their face value of $1000....

\* \* \* \* \* \*

[T]he willingness of investors to buy Cuban government bonds must be viewed as the high-water mark of investor confidence in the Cuban economic and political system. Under no circumstances would investors have discounted the value of business assets that lay within the grasp of the Cuban government less than the obligations of the government itself. Indeed, a prudent, knowledgeable investor attempting to value Essosa's assets in June of 1960 would have started with 43%, the amount by which the market discounted the bonds of the Cuban government, and then added further discounts on the basis of the additional risks to which the oil refining and distribution business would be subject.... [The opinion lists several such additional risks.]

\* \* \* \* \* \*

In light of these factors, the court finds that, in valuing Essosa's Cuban assets, a knowledgeable buyer would have discounted the value of those assets by a risk factor of some 65%. The book value of the refinery and other assets was $76 million; the discounted value would therefore have been $26.6 million, substantially less than the $48 million in liabilities. The court therefore finds that, as of June 30, 1960, an arms' length, knowledgeable investor would have been unwilling to pay more than a nominal sum for Essosa's Cuban assets, if such assets were burdened with Essosa's liabilities. Essosa was therefore left insolvent after the reorganization.

7 Cl.Ct. 347, 352-54 (footnotes omitted).

The government argues that Chief Judge Kozinski's finding of insolvency as of June 30 is binding in the present proceeding. The government points out that the sole issue decided by the Federal Circuit in *Exx-on I* was whether a potential fraudulent conveyance claim by Esso Export against Standard precluded the $27.4 million bad debt deduction. Furthermore, the government asserts, the Federal Circuit in *Exxon II* expressly disavowed having addressed the insolvency issue in *Exxon I*, either expressly or by implication. Thus, the government concludes, the insolvency finding was never disturbed on appeal and cannot be reexamined here.

The government's position must be rejected, for several reasons. The main flaw in the government's argument is that Chief Judge Kozinski's insolvency analysis was dictum. As he stated in footnote 8 to his opinion:

> While the court has found that Essosa was in fact insolvent after the reorganization, such a finding is not necessary to sustain defendant's position. It would have been enough for the court to find that the question of solvency was sufficiently in doubt so that a fraudulent conveyance action by Esso Export against Standard would have had a reasonable probability of success. As is more fully explained below, *see* pp. 354–355 *infra*, if a creditor has a reasonable prospect of collecting the debt, the debt is not worthless, particularly where the amount owed is very large. Plaintiff does not dispute that there was much political and economic turmoil in Cuba in mid–1960, sufficiently so as to raise reasonable doubts about Essosa's solvency. These doubts would have provided a sound basis for bringing a fraudulent conveyance action with a reasonable prospect of success.

7 Cl.Ct. at 354.

■ Chief Judge Kozinski's finding of insolvency on June 30 is not immune from reexamination here because, according to Chief Judge Kozinski himself, the Cuban bond analysis was not necessary to his decision. It is true that a trial court, when conducting proceedings following a remand, cannot disregard its previous factual findings if those findings were not disturbed on appeal. *See, e.g., Fidelity & Deposit Co. of Maryland v. USAFORM Hail Pool, Inc.,* 523 F.2d 744, 759 (5th

Cir.1975), *cert. denied,* 425 U.S. 950, 96 S.Ct. 1725, 48 L.Ed.2d 194 (1976). However, this general rule does not displace the well-established principle that statements of a court, which are not integral to the resolution of matters before that court, are not entitled to any preclusive effect in a later proceeding. *See, e.g., In re Cassidy,* 892 F.2d 637 (7th Cir.1990) (appellate court's determination that taxpayer's debt was not dischargeable was dictum, and therefore was not entitled to preclusive effect under *res judicata* principles); *Ducey v. United States,* 830 F.2d 1071 (9th Cir. 1987) (district court's statement that plaintiffs had proven simple negligence was dictum, and therefore was not entitled to preclusive effect under law-of-the-case principles); *La Paz v. Danzl,* 646 F.Supp. 914 (N.D.Ill.1986) (statement in order entered following suppression hearing that police officers had not used excessive force was dictum, and thus, was not entitled to preclusive effect under collateral estoppel principles in later civil rights action brought by arrestee).

The government also argues, relying on RUSCC 52(a), that Chief Judge Kozinski's finding that Essosa was insolvent on June 30, 1960 should not be set aside unless it is clearly erroneous. RUSCC 52(a) provides in part that "[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." In light of the fact that Chief Judge Kozinski's insolvency finding was unnecessary to his resolution of the case, the court has doubts as to the applicability of RUSCC 52(a); the court is not "setting aside" his finding, it is disregarding it as dictum. Furthermore, RUSCC 52(a) sets forth the standard for appellate review of Claims Court findings of fact, and this court is not reviewing Chief Judge Kozinski's ruling in an appellate capacity. Rather, the court must determine the extent to which a prior opinion which was reversed on appeal bears on the current proceeding. Finally, the finding of insolvency was based on a mathematical analysis of bond data submitted by the parties. Such a finding is entitled to less deference than that which would be accorded a finding based upon weighing the conflicting testimony of witnesses. Indeed, as Chief Judge Kozinski stated, "[t]he evidence at trial presented a surprisingly consistent view of the events following Castro's rise to power." Thus, it is only the conclusion reached by Chief Judge Kozinski, based upon an analysis of the evidence submitted, that will be reexamined.

II. Essosa's solvency immediately following the reorganization.

■ Having determined that the court is not foreclosed from reexamining Chief Judge Kozinski's finding that the June 30, 1960 reorganization rendered Essosa insolvent, the court now turns to the question of whether, in fact, that finding was correct. For the reasons set forth below, the court concludes that the analysis of the Cuban bond data, and its application to other types of investments, was faulty. Therefore, the court finds that immediately following the June 30, 1960 reorganization, Essosa was still solvent.

The witnesses who testified at trial all expressed the view that in June 1960, no one anticipated that United States–Cuban relations would break down completely. The United States was Cuba's principal trading partner, supplying 60%–80% of Cuba's imports, and consuming nearly 70% of Cuba's exports. Furthermore, Cuba did not produce its own crude oil in 1960, and thus, it was entirely dependent on crude oil imports from abroad. "The possibility that the Soviet Union would supply the island's entire crude oil needs on a sustained basis ... was considered highly remote in 1960." 7 Cl.Ct. at 353. The eight witnesses who testified at trial all stated that although they foresaw the possibility of some further disruption of the activities of oil companies operating in Cuba, they believed in June 1960 that eventually oil company operations would return to normal. Former Treasury Secretary Robert B. Anderson testified in his deposition that up until the unexpected expropriation of United States property by the Cuban government in August 1960, the members of the Eisenhower

cabinet were optimistic that the United States and the Castro regime would work out their differences. Thus, Chief Judge Kozinski concluded that knowledgeable investors would have continued to invest in assets in Cuban territory even after Castro's rise to power. It was thus proper to assume that there was a market, and therefore, a fair market value, for Essosa's Cuban assets.

As stated earlier, the apparently undisputed book value of Essosa's Cuban assets immediately before the reorganization was $76 million; Essosa's liabilities were approximately $48 million. Chief Judge Kozinski discounted the book value of the assets by 43%, the discount rate at which Cuban bonds were selling in 1960, plus an additional 22% for other business risks,[4] and concluded that the fair market value of Essosa's assets were substantially less than its liabilities. However, it was error to apply the 43% bond discount rate to a hypothetical equity investment in Essosa's Cuban division.

The analysis must begin with a few fundamentals of investing. Generally, as the riskiness of an investment increases, so does the rate of return needed to attract investors. Another way of looking at this is that as the risks associated with an investment increase, the price investors are willing to pay decreases; this decrease in price is known as a discount. The difference between the normal or base rate of return on an investment and the rate of return for which investors are willing to pay, expressed as a percentage of the return on the investment, is known as the discount rate. For example, the discount rate on a $1000 bond purchased for $950 would be 5% ($1000 expected return minus price of $950 equals $50, which is 5% of $1000).

"Risk premium" refers to the increased yield that investors demand before putting their money in an investment carrying greater-than-normal risk. Risk premium is expressed as the number of percentage points over and above the normal or base rate of return on an investment. For example, in 1960, virtually risk-free United States Treasury bills were yielding 3.99% to maturity. In 1960 Cuban bonds, certainly not a risk-free investment, were yielding 9.88% to maturity. Thus, the risk premium required to attract investors to Cuba in 1960 was 5.89 percentage points, the difference between the normal rate of return on risk-free government securities, 3.99%, and that of the riskier bonds issued by the Cuban government, 9.88%. The court accepts as correct Chief Judge Kozinski's implicit finding that an investor would demand a 5.89 percentage point risk premium over and above a normal return, before investing in Cuban assets. However, it was a mathematical error to assume that the amount by which investors discount the price they will pay for a given investment is directly proportional to the risk premium.

An example will help to illustrate the point. Consider a hypothetical bond auction, where the prices of the bonds are determined by the average of the bids received. Each bond is issued by a different entity. An A bond is a safer investment than a B bond, a B bond is safer than a C bond, and a C bond safer than a D bond. Each bond will pay $1000 at maturity one year from purchase, assuming the issuer is able to meet its obligations in one year. See Figure I. (Figures are rounded to the nearest dollar.)

| BOND | FACE VALUE | PRICE | YIELD | DISC. RATE | INCR. IN YIELD | INCR. IN DISC. RATE |
|---|---|---|---|---|---|---|
| A | $1000 | $909 | 10% | 9.1% | | |
| | | | | | 10 pts. | 7.6 pts. |

4. Among these additional risks were: (i) the possibility that currency exchange controls would not allow expatriation of profits; (ii) the possibility that the Cuban government might force Essosa to refine Soviet crude oil and then market the refined oil in competition with western oil companies; (iii) the possibility that government regulation or taxation might be increased; and (iv) the possibility that key personnel might flee Cuba.

| BOND | FACE VALUE | PRICE | YIELD | DISC. RATE | INCR. IN YIELD | INCR. IN DISC. RATE |
|------|-----------|-------|-------|-----------|----------------|---------------------|
| B | $1000 | $833 | 20% | 16.7% | | |
| | | | | | 10 pts. | 7.1 pts. |
| C | $1000 | $769 | 30% | 23.7% | | |
| | | | | | 10 pts. | 4.9 pts. |
| D | $1000 | $714 | 40% | 28.6% | | |

Figure I

As a result of the auction, the prices are set as indicated above. The yield and discount rate have been calculated based on the price set. The key to understanding the error in the first trial judge's analysis lies in the last two columns, which set out the increase in yield and increase in discount rate between issues A and B, B and C, and C and D. As the chart illustrates, discount rates do not increase in direct proportion to increases in yield. An investor choosing a B bond over an A bond increases his yield by 10 percentage points (the risk premium), and discounts the B bond by an additional 7.6 percentage points. An investor choosing a D bond over a C bond also increases his yield by 10 percentage points, but he only needs to discount the D bond by an additional 4.9 percentage points. The principle is clear: it requires less of a discount to boost the return on an investment carrying a relatively high rate of return, than the discount required to boost the return on an investment carrying a relatively low rate of return by the same amount.

Chief Judge Kozinski erroneously assumed that "[u]nder no circumstances would investors have discounted the value of business assets that lay within the grasp of the Cuban government less than the obligations of the government itself." 7 Cl.Ct. at 354. It would have been accurate to say that under no circumstances would an investor invest in business assets that lay within the grasp of the Cuban government without demanding an additional 5.89 percentage points—the risk premium required to attract investors to Cuba—over and above the normal return.

Exxon's expert testified that a normal rate of return on an investment in an oil refining business would be about 10.6%. That is, without accounting for any increased risks associated with equity investments in Cuban businesses, an investment in Essosa would have been expected to return 10.6%. From the discussion above, it is clear that the price for an investment normally earning 10.6% would not have to be reduced as much as the price of an investment normally earning 3.99% in order to earn an additional 5.89 percentage points, the risk premium required to attract investors to Cuba in 1960. In fact, plaintiff's expert witness has calculated that in order to increase the yield on an investment in Essosa by 5.89 percentage points, the price of the investment would only have to be discounted by 21%.[5]

Assuming arguendo that Chief Judge Kozinski's "additional risk factors" should also be considered, the value of Essosa's Cuban division would have been discounted by an additional one-half.[6] Thus, the 21% risk premium required to attract investors would increase to 31.5%. Discounting the $76 million book value of Essosa's Cuban

5. This result is not surprising. The yield on investment paying 16.49% is only 1.55 times greater than that of an investment paying 10.6%, whereas the yield on a bond paying 9.88% is 2.76 times greater than that of a bond paying 3.99%. In both cases, the increased yield—the risk premium—is 5.89 percentage points. Achieving the larger increase in yield requires a larger increase in the discount.

6. Chief Judge Kozinski's "additional risk factors" increased the 43% discount rate by 22%, or about one and one-half times. However, it should be noted that this 22% figure was his subjective assessment of the additional risks.

assets by 31.5%, its assets had a market value of approximately $52 million. With liabilities of $48 million, Essosa was solvent immediately following the June 30, 1960 reorganization.

### III. The merits of the offset claims.

■ In light of the court's conclusion that Essosa's insolvency was caused not by the June 30, 1960 reorganization, but by subsequent events beyond the control of Standard Oil, the court is compelled to conclude that the worthless stock deduction was properly taken. The government has advanced no arguments in the current proceeding relating to the worthless stock deduction, other than asserting that the reorganization resulted in Essosa's insolvency. However, Exxon states in its "Brief on Remand" that the proper amount of the worthless stock deduction is $1.49 million, not $2.13 million. The government's response does not address the question of the proper value of the worthless stock offset, so the court must assume that it is in agreement with Exxon's valuation. Therefore, the government's worthless stock offset claim is allowed to the extent of $640,000.

Finally, the court will briefly consider whether the government's offset claim for the $9 million bad debt can succeed, notwithstanding the court's conclusion that Essosa did not become insolvent until the Cuban government took over the refinery on July 1, 1960. Most of the government's brief on remand is devoted to arguing that either Chief Judge Kozinski's finding as to the date of Essosa's insolvency cannot be reexamined, or that in any event, that insolvency finding was correct. Although the government correctly points out that the

merits of the offset claims have hitherto not been addressed, from the record as it stands and the discussion in part II above, the government's offset claim relating to the $9 million bad debt deduction cannot be sustained.[7]

The government once again asserts its constructive repayment argument in asking the court to disallow the $9 million deduction. Relying primarily on case law involving liquidation and bankruptcy reorganizations, the government argues that Essosa's distribution of Essosa Ltd. stock to Standard Oil, an Essosa shareholder, must be allocated first to repayment of the $9 million loan. The government's argument must be rejected, since the rule that distributions to creditor-shareholders must be allocated first to repayment of debt only applies where the distribution renders the debtor corporation insolvent. As discussed above, the June 30, 1960 distribution of Essosa Ltd. stock to Standard Oil did not render Essosa insolvent. The court sees no reason why it should analogize the Essosa transaction to the liquidation or reorganization in bankruptcy of a business, where the debtor goes out of existence, because neither the intent nor the effect of the reorganization was to liquidate Essosa.

The government also argues that "no debt remains to support a deduction when both the right to enforce an obligation and the obligation itself are held by the same entity." The government contends that the spinoff of Essosa's non-Cuban assets to the newly-formed Essosa Ltd., a wholly-owned subsidiary of Standard Oil, effectively merged the $9 million debt and the right to collect the debt in Standard. As a result of

---

7. Exxon argues that the government's offset claim respecting the $9 million bad debt deduction fails even if the reorganization rendered Essosa insolvent. According to Exxon, the government's position requires the court to recharacterize the distribution of Essosa Ltd. shares to Standard as repayment of the debt. Exxon argues that such a recharacterization would be improper, in light of the Internal Revenue Service's ruling on the section 355 reorganization that Standard was to receive the Essosa Ltd. stock in its capacity as shareholder (as opposed to its capacity as creditor). However, Chief Judge Kozinski held that the govern-

ment was not bound by the section 355 ruling, 7 Cl.Ct. at 352, and this holding was never addressed or disturbed on appeal. Thus, it is the law of the case that the government is not foreclosed from challenging Essosa's solvency immediately following the reorganization. Although the court has found that in fact the reorganization did not cause Essosa's insolvency, the court wishes to make clear that the Internal Revenue Service's section 355 ruling in no way influenced the court's analysis. As Chief Judge Kozinski recognized, the section 355 ruling was for a limited purpose.

this "merger," the $9 million debt was extinguished. This argument fails because it is premised on the notion that the shares of Essosa Ltd. were "impressed with debt." Clearly, they were not. Immediately following the reorganization, Essosa was solvent, and was the sole obligor on the $9 million loan. Subsequent events did not make Essosa Ltd. responsible for repayment.

The government also argues that the $9 million bad debt deduction cannot be allowed because the reorganization of Essosa was carried out for the sole purpose of protecting Standard's equity interest in Essosa. This argument also fails, because again, it presupposes that the reorganization rendered Essosa insolvent.

## CONCLUSION

In light of the foregoing, the court concludes as follows: (i) Exxon is entitled to its entire bad debt deduction of $27,397,440; (ii) the government's worthless securities offset claim is allowed in part, to the extent of $640,000; and (iii) the government's offset claim relating to the $9 million bad debt deduction is denied. The parties shall, within 60 days, file a joint memorandum setting forth the proper amount of the refund due Exxon, exclusive of interest on the judgment, in light of the court's conclusions. The court will then direct the clerk to enter judgment. If the parties are unable to reach an agreement as to the amount due, each shall submit its own memorandum setting forth the amount due, as well as the calculations employed in arriving at such amount. It is so ordered.