EUROPEAN AMERICAN BANK AND TRUST COMPANY, European American Banking Corporation, and European American Bank–Corp., New York Corporations, Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 135–82T.

United States Claims Court.

June 19, 1990.

Alan Rosenberg, New York City, attorney of record for plaintiffs. Morton M. Manneker, Abraham Gutwein and Proskauer, Rose, Goetz and Mendelsohn, of counsel.

Thomas J. Sykes, Washington, D.C., with whom was Asst. Atty. Gen. Shirley D. Peterson, for defendant. Mildred L. Seidman, Dept. of Justice, of counsel.

## OPINION

HARKINS, Senior Judge.

European American Bank and Trust Company (EAB or plaintiff), European American Banking Corporation, and European American Bankcorp are New York State banking corporations. Plaintiff is a full service bank, and a member of the Federal Reserve System and the Federal Deposit Insurance Corporation (FDIC). At all relevant times, EAB's stock has been owned jointly by six European banks.

The complaint, initially filed on March 15, 1982, was a claim for income tax refunds for tax years 1973–79. The complaint was first amended on January 21, 1988, and a second amended complaint was filed November 20, 1989.

As amended, the complaint presents claims relative to two transactions: (1) issues related to plaintiff's October 1974 agreement with the FDIC for the purchase of assets and assumption of liabilities of the insolvent Franklin National Bank (FNB); and (2) issues related to accrual of interest and principal on an oil production payment transaction with Standard Oil Company (Indiana) (S.O.Ind.) to finance the purchase of a working interest in the West Whitebead oil field in Garvin County, Oklahoma. The claim relative to the oil production payment was included in the January 21, 1988, first amended complaint, but pretrial preparation to that time had centered on the Franklin National Bank issues. By stipulation disposition of the new oil production payment claim was severed from the trial of the FNB issue.

Trial sessions on the FNB issue were held April 18–29, 1988, and further trial proceedings were scheduled. The parties were able to settle the FNB issues, and the scheduled trial sessions were not needed. Review and approval procedures on the settlement have not been completed, and as of May 17, 1990, the matter was pending.

Discovery on the oil production payment claim was undertaken by both parties, and extensive documentary information was secured. Defendant, on February 21, 1990, moved for partial summary judgment on the oil production payment claim, the only remaining claim. Defendant's motion was supported by 882 documentary pages in 35 exhibits, plaintiff's opposition added 18 additional pages in four exhibits.

Discovery in this case has been adequate to establish all material facts that are relevant to issues in the oil production payment claim; further evidentiary proceedings would not be productive. The material facts are not in dispute and the income tax refund claims that arise from the Standard Oil Company (Indiana) transaction may be resolved as a matter of law. Disposition by the summary judgment procedure is appropriate.

The sole remaining claim, presented in paragraphs 123–126 in the first and second amendments to the complaint, is separate and distinct from the FNB claims that the parties have agreed to settle. In the circumstances, judgment pursuant to RUSCC 54(b) on this separate claim is appropriate.

## I.

Standard Oil Company (Indiana) through its operating subsidiary Amoco Production Company (Amoco), in mid–1974 purchased from two sellers working interests in the West Whitebead oil field in Garvin County, Oklahoma. Amoco's purchase amounted to an aggregate gross working interest of 49.7%; according to EAB's record, the total consideration was $29,625,000. The West Whitebead field, which had been discovered in 1970, was not fully developed in mid–1974. The field operator, Lario Gas Company, owned a 50.1% working interest in the field, and Kerr–McGee Oil Company, by contract, was the purchaser of all of the oil and gas produced from the field.

Amoco's purchases were financed through cash payments by Amoco of $9,875,000, and with ABC production payments that totaled $19,750,000, through loans from EAB. In the purchase, the sellers retained a right to 90 percent of the

net revenues of oil and gas sales, up to the principal amounts of the production payments.

In an ABC transaction, the owner of oil producing property conveys the interest in the oil field to the buyer by an agreement in which the seller retains part of the property in the form of a "production payment" that is to be financed through a transaction that involves a loan to a separate legal entity, a "shell" company. The production payment, which represents an interest in the oil and gas in the ground, by separate agreement is assigned to the shell company and the production from the field is allocated to that company in proportion to its ownership. In exchange for a loan, in the amount of the value of the production payment, the shell company makes a note to the lender in that amount, assigns a mortgage on the production payment as security for the loan, and assigns a portion of the monthly sales revenues on the oil produced, at a rate (dedication rate) sufficient to retire the loan to maturity.

In the West Whitebead purchase, the production payments and the loans were structured through three "shell" companies: Ibis Oil Company, Heron Oil Company and Rook Oil Company (for convenience these companies are referred to as the "Birds" and the three loans as "the Birds loans"). The Birds were distinct legal entities that were incorporated by an attorney for Amoco, with a nominal capitalization of $500. Initially, the stock of the Birds was held by a corporation called Stork Oil Company, which was owned by attorneys for Amoco. Subsequently, the Stork Oil Company was dissolved and its stock distributed to a partnership composed of attorneys for Amoco. The only significant assets of the Birds were the production payments. The sellers assigned the production payments to the Birds in exchange for payments that total $19,750,000. To pay the sellers, the Birds borrowed a total of $19,750,000 from EAB, and dedicated the full amount of the production payments to repay the loans.

The first transaction (Ibis) was a purchase on July 9, 1974, for $15 million of a 25% gross interest less royalties (21.08% net interest) in the West Whitebead oil field. Amoco paid $5 million to the seller, and $10 million was paid in the form of a production payment loan from EAB to Ibis.

The second transaction was in two parts for a purchase for $14,625,000 of a 24.7% gross interest less royalties (20.9% net interest) in the West Whitebead oil field. Amoco paid a total of $4,875,000 to the seller. EAB made a production payment loan (Heron) on July 31, 1974, in the amount of $7,355,000. On October 8, 1974, EAB made a production payment loan (Rook) in the amount of $2,395,000. The total amount of the Birds loans was $19,750,000.

The Birds loans had an interest rate set at ½ of 1 percent above either EAB's best rate (to prime U.S. corporate borrowers) or the London Interbank Offered Rate (LIBOR). The interest rate was at the same rate and on the same terms as the production payments. The interest rate and payment due date could be established in selected interest periods of one, three or six months. The amount due was computed on the unpaid balance outstanding for the selected period, including any unpaid ("capitalized") interest.

The Birds loans were secured and payable only out of the production payments. The Birds loans were not secured by any assets of Amoco or of S.O.Ind.

Kerr–McGee's payments for the West Whitebead oil production were by checks to Amoco. The checks were deposited in Amoco's account at the National Bank of Tulsa. Payments of interest and principal to EAB on the Birds loans were made by transfer from Amoco's account to EAB's accounts of the Birds.

The Birds loans were the first oil production payment loans made by EAB. Negotiations for the Birds loans involved an EAB vice president loan officer, an assistant treasurer of S.O.Ind. and a representative of Amoco. In connection with the Ibis transaction, EAB's negotiator on June 13, 1974, told EAB's counsel:

In addition to the above, Standard will pay us an extra ¼ of 1% on any loans

outstanding with such payment to be computed by EAB on the basis of tax payments made through us by Standard. (This arrangement is between Standard and ourselves and should not appear in any of the Ibis Oil Company agreements).

During negotiations for the Heron transaction, the extra payment by S.O.Ind. was increased to ⅜% against loan outstandings. The extra payment was to be made through compensating balances in EAB and/or tax payments through EAB.

EAB loan officer's analysis for the Ibis transaction was based on a 10–year maturity period, at an average interest rate of 10%. This produced estimated payments of $10 million in principal, plus $5 million in interest, for a total repayment of $15 million. The loan officer's analysis for the Heron/Rook transactions estimated payments over 10 years of $9,750,000 in principal and $4,875,000 in interest, and a total repayment of $14,625,000.

The loan officer's recommendation on the Ibis and Heron/Rook transactions states:

We recommend approval based on the proposed facilities in favor of Ibis Oil Company and Heron Oil Company. Standard Oil has stated to us that no bank has ever lost money on one of their Production Payment Loans. They have also given us their verbal assurance that if the oil production from the South West Whitebead Field is not sufficient to retire our loan, other reserves would be assigned to cover our facilities and have also told us that in the event that an excess profits tax is imposed on oil revenues, Standard will guarantee that the price per barrel received does not fall below $8.00 per barrel.

Final approval by the EAB credit committee of the Heron transaction was on October 23, 1974. The approval was for a $7,355,000 loan, with a maturity of 10 years from the date of take down (July 31, 1974), repayable in approximately equal monthly installments beginning immediately, and with final maturity on July 31, 1984.

The promissory notes to EAB in the Birds loans did not reflect the 10–year loan period. The notes facially promised the principal would be paid within a 3–year period: Ibis—May 31, 1977; Heron—June 30, 1977; and Rook—September 30, 1977. Although the principal of each loan ostensibly was due in less than 3 years, neither EAB nor Amoco expected, even at the outset, that the Birds loans would be repaid within that period.

The attorney for Amoco, who officially served as president and a director of each Bird company, stated it was the practice to structure ABC transactions so as to avoid payment of Oklahoma franchise taxes. A promissory note payable within 3 years is classified under the Oklahoma franchise tax law as debt, and not as capital.

The mortgages in the Birds loans included assignments of the production payments to EAB and, in Section 3.2, provided "the order of application to be made by the Bank of all moneys received by the Bank pursuant to the assignment." The order was:

FIRST: To the payment of interest accrued and unpaid on the Note to and including the date of such application;

SECOND: (Relates to fees to the Birds. Rearranged application of production payments in the event of default. As rearranged, the payments still were to be applied first to interest and thereafter to principal);

THIRD: (Relates to certain taxes);

FOURTH: The balance shall be applied to the payment or prepayment without penalty or premium of the principal of the Note; and

FIFTH: After payment in full of the Note and all other indebtedness secured hereby, there shall be paid to the Company an amount equal to the amount (if any) previously withheld by the Bank and applied pursuant to the proviso of clause SECOND above;

Section 3.3 of the assignment provides for application of payments after default on the promissory note. It provides, in part:

Notwithstanding the other provisions of this Article, *the Trustees or any re-*

*ceiver appointed in judicial proceedings* for the enforcement of this instrument shall have the right to receive all of the income, revenues, rents, profits and proceeds from the Mortgaged Property (including the Production Payment Hydrocarbons and all proceeds therefrom) after the Note has been declared due and payable in accordance with the provisions of Section 5.1 hereof and to apply all of said income, revenues, rents, profits and proceeds, and to exercise all the rights, privileges, powers and remedies conferred upon the Grantor by the Conveyance, in the sole interest of the holder of the Note, without regard to the effect such action may have upon the rights of any other person under the assignment contained in Section 3.1 hereof. [Emphasis supplied.]

Section 5.1 of the assignment provides remedies in the event of default. The section definition of "Events of Default" includes:

A. default by the Company in any payment of principal of or interest on the Note when the same shall become due and payable;

\* \* \* \* \* \*

... in any such event, the holder of the Note may, by notice in writing mailed to the Company and the Trustees, declare the entire unpaid principal of and interest then accrued on the Note to be forthwith due and payable, whereupon the same shall become and be forthwith due and payable, without presentment, protest, demand or further notice of any kind.

When Amoco purchased the interests in the West Whitebead field in 1974, 11 producing wells had been drilled. Amoco's evaluation of the field was based on a reserve report dated April 11, 1974, that had been prepared by an independent consultant firm based in Oklahoma for the seller of the first 25% interest. This report was extrapolated by Amoco to include its purchase of the second 25% interest. Gross reserves as of May 22, 1974, of the field were estimated at 30.8 million barrels, and the net recoverable reserves for the field (on a 60% recovery factor), were esti-

mated at 18.5 million barrels. For the Birds interests, the net recoverable reserves were estimated at 7.8 million barrels.

In the negotiations with Amoco and S.O. Ind., EAB relied on analyses by Amoco that estimated a payout period from 7.6 to 11.6 years. In a review of the Birds loans, an October 2, 1978, report to EAB's senior vice president states in part:

The facilities were approved based on the Fort and Miller report and its interpretation by Amoco together with the fact that Standard of Indiana had stated to us that no bank had ever lost money on one of their production payment loans. We also had the verbal assurance of Standard of Indiana that if production from the Field was not sufficient to cover our facilities, additional reserves would be assigned.

Production from the West Whitebead field was disappointing. Wells drilled on Amoco's acreage resulted in six dry holes and one abandonment after testing water. In addition, unitization of the field was delayed and unexpected water production caused the field operator (Lario Gas) to curtail withdrawal rates. Amoco revised its interpretation of the field data. As of January 1, 1976, Amoco's revised estimate put gross reserves for the total field at 12.4 million barrels, remaining recoverable reserves for the total field (on a 50% recovery factor) at 6.2 million barrels, and net recoverable reserves for the Birds interests at 2.6 million barrels.

Amoco's revised estimates were provided to EAB and were discussed with S.O.Ind. in early 1976. During these discussions EAB proposed several actions. An EAB memorandum to the examining committee, dated August 31, 1976, describes these proposals as follows:

1. Increasing the percentage of revenues dedicated to retiring the loan from 90% to 100%.

2. Having Indiana prepay interest, thereby allowing the proceeds we receive to be applied to the repayment of principal.

3. Dedicating additional proven reserves, (separate from the Whitebead field) in sufficient amount to adequately secure the loan.

4. Arranging for an Indiana buy-out or guarantee.

5. Creating a non-interest bearing time deposit (from Indiana) equal in amount to the loans. With funding costs eliminated, interest on the loans would be forgiven, thereby accelerating the repayment of principal.

During these discussions, S.O.Ind. noted that all of EAB's suggestions were beyond the contractual obligations, and argued the proposals would subject S.O.Ind.'s other nonrecourse, off-balance-sheet obligations to possible reclassification. S.O.Ind. requested EAB to defer immediate action until November, pending evaluation of additional drilling, increased withdrawals from good wells, and finalization of government "new" and "old" oil pricing regulations. EAB agreed. The August 31, 1976, memorandum, to EAB's examining committee, notes:

Production from the field has reportedly been increased by 200 b.p.d. (with the operator reviewing the feasibility of an additional 200 b.p.d. increase) and additional seismic testing indicates the presence of a separate structural formation within the Whitebead field area. Indiana plans to drill two wells to test for the presence of hydrocarbons within this formation, but results will not be available for several months.

As of August 31, 1976, payments for interest accruals had caught up with current interest requirements on two of the three Birds loans. In April 1975, past due interest was at a total of $395,000. During the period April 1, 1976, through August 31, 1976, payments on the Rook and Ibis loans repaid all past due interest accumulations and provided modest reductions of principal: $3,442 on the Rook loan; $15,332 on the Ibis loan. In this period, payments on the Heron loan did not catch up, and accrued and unpaid past due interest amounted to $56,275.

During 1976, Amoco's acquisition department reviewed the purchases in the West Whitebead field and analyzed the economic effects on EAB and on Amoco of the lower reserve estimates and disappointing production results. Amoco's economic analysis and engineering data suggested that the production payment might not be retired from existing reserves. The economic and engineering data were reviewed and discussed with S.O.Ind.'s Financial Department and with EAB's representatives. In the 1976 discussions, both parties recognized there were circumstances under which EAB could be paid the full $19,750,-000 principal amount. Variable factors included increases in oil prices, increased production based on unitization, and further development drilling that warranted revision of reserve estimates.

Amoco's 1976 internal analysis presented choices that involved (1) evaluation of West Whitebead's potential and (2) whether to assist EAB. Amoco's acquisitions department recognized the possibility that the production payment might never pay out, and concluded that Amoco's "best" economic alternative was to do nothing, even though this "could compromise our banking relationships."

Factors that influenced the timing of any determination to assist or not to assist EAB were identified, as follows:

1. We do not fully understand field geology and reservoir performance.

2. Lario as operator is initiating a drilling and rate improvement program which will require about 4–6 months to complete.

3. Neither Amoco nor EAB (in fact) have a strong economic incentive to act now.

4. Under current BPCL and pricing assumptions, upside potential outweighs downside risk.

If some immediate action is deemed advisable, we could prepay one year's interest expense (BFIT cost $1.5 million, AFIT cost $0.750 million) and increase dedication to 100% (BFIT cost = AFIT cost = $0.250 million annually). This same result can be achieved through

placement of large compensating balances with EAB.

In a memorandum dated March 9, 1977, EAB's president was advised that by September 1976 past due interest on the Birds loans had been reduced to the point that modest reductions in principal were possible. Thereafter the monthly payments had been sufficient to cover interest and principal, and on February 28, 1977, the balance of the three loans had been reduced by $201,687 to $19,548,313. Although payments of principal and interest were current, revised estimates indicated "a possibility that a portion of the production payment loans may not be retired prior to depletion of the oil reserves." Estimates of recoverable reserves had been reduced to 6.2 million barrels. Other variables included decontrol of prices, and daily field production rates.

EAB's operations were examined by the New York State bank regulatory authority, and in April 1977, the bank examiner classified the Birds loans in the doubtful and substandard categories. The bank examiner's statement described the prospects for repayment of the loans and EAB's intent to apply payments to principal only as follows:

> ... Loans were to be repaid over a 10–year period, however recently revised projections, together with lagging production, indicate the probability that a portion of the production payment loans may not be retired prior to depletion of the oil reserves. Also, estimated total recoverable reserves have been drastically reduced from original projections. Efforts are being made to improve the terms of the original loan agreement, ostensibly to achieve more rapid reduction of principal. Results to date not evident. Based upon the unfavorable revised projections of production payments and recoverable reserves, the full collection of the loan principal at the present government-controlled oil prices appears doubtful. Management intends to apply all future production payments to principal only. In view of the foregoing, the present value of this production payment loan appears to be considerably less than the book value and is accordingly classified with 5MM in the doubtful category and the balance substandard. An expected increase in the controlled price of oil at the wellhead may improve this work out situation.

In an internal memorandum dated April 20, 1977, Amoco's Planning and Economics Department evaluated the status of the West Whitebead purchase and EAB's proposals. At a meeting on February 11, 1977, EAB had proposed that the current interest rate on the production payment be reduced from the current variable rate (roughly 7%) to 1.25%, and the dedication be increased from 90% to 100%, effective January 1, 1977. EAB also "requested that a $15 million compensating balance be kept on deposit at EAB, interest free, during the production payment payout." Amoco's analysis states that the compensating balance, assuming 4% (AFIT) opportunity, represents a $17,900,000 disability, $6,900,000 discounted at 10%. Amoco's analysis noted that inability to retire the principal of the loan "is a risk assumed by any bank in making a production payment" and that it is likely that Amoco will continue to receive pressure from EAB to undertake some alternative, "even if only cosmetic."

Amoco's April 20, 1977, analysis included ten alternative courses of action for the West Whitebead purchase, four of which were given serious consideration. The "status quo" case assumed no change in the existing agreement. EAB's various offers were considered in other alternatives. Amoco's analysis includes the following explanation:

> Exhibit 3 summarizes the economics for these alternatives. Incrementally from January 1, 1977, the "status quo" is clearly the most economically favorable alternative. Considering undiscounted cash flows, however, the "status quo" and the bank offer with either no or 1.25% interest are essentially equivalent.

Amoco's April 20, 1977, conclusions were stated as follows:

The failure of the West Whitebead properties to fulfill original expectations has produced a situation in which the production payment with EAB will not be retired under provisions of the current arrangement. EAB has shown a considerable degree of concern and is pressuring Amoco to modify the production payment. Consideration of the alternatives must give recognition to both Amoco's economics and intangible considerations, such as bank relationships and retirement of the production payment. Maintaining the current agreement provides the most favorable discounted cash flow position but leaves $16.8 million unrepaid. Of the alternatives considered to be reasonable and feasible, increasing the dedication to 100% and reducing the interest rate to 0% effective January 1, 1977, appears to represent one of the most reasonable compromises.

Amoco Production recommended the "status quo" position, *i.e.*, to continue to operate with no change in the existing agreement. An April 22, 1977, review recognized that consideration of bank relationships or other intangibles could modify this conclusion. The review notes:

If another course of action is deemed appropriate based on consideration of bank relationships or other intangibles, the alternative most acceptable to Amoco would be the bank's offer, i.e., reduction of the interest rate to nearly zero and increase of the dedication to 100%, but with little or no additional balances. Any modification which improves the bank's situation, of course, worsens Amoco's position. All things considered, the bank offer provides the minimum deterioration to Amoco's economics. This approach is acceptable to Amoco's management.

The review also asserts that EAB's cash position was protected in all cases seriously considered. The review states:

While we are sensitive to the impact of the West Whitebead operations on our bank relationships, it is important not to lose sight of the bank's ultimate cash position. As shown in the exhibits to the memorandum, the bank achieves a positive before tax cash position in all cases given serious consideration, including the status quo.

On June 16, 1977, an internal EAB memorandum to Files analyzed the Birds loans and noted that, at the then selling price of oil at $7.35 per barrel, the anticipated future cash flow from sale of estimated revenues would be $16,170,000, a shortfall of $3,830,000. The memorandum includes the following comments:

We are in a rather unique situation in regards to estimating any future possible losses that might arise on these loans. Some factors to consider include:

1. There is no time limitation on the recoverable oil reserves used as security. We will receive payments against these loans for as long as oil is being recovered. Presently these estimates take us to at least the year 2000.

2. The geological studies that yield estimates of recoverable oil reserves are at best estimates and subject to inaccuracies that could be in our favor and be underestimating the extent of the collateral.

3. Despite the current concern of the Carter Administration, it is expected that over the next decade oil prices will rise. It is felt that a minimum, oil prices will keep pace with inflation.

4. Even though the estimates of recoverable oil reserves is 2,200,000 barrels, the cash flows are dependent upon how fast this oil is pumped from the ground. If production is held down while current selling prices remain low and more oil is subsequently produced when prices are higher, then our recovery on the loans will be greater.

Any single item mentioned above or any combination of these items can have a significant effect on our estimates of future cash flows relating to these loans. Because of this extreme uncertainty and unpredictability, we propose a special treatment for cash receipts on these loans that will allow us latitude in the possible future recording of income as

the 4 points discussed above become clearer with the passage of time.

On June 17, 1977, EAB determined to transfer payments on the Birds loans from regular accrual loans to deferred interest accounts, effective July 1, 1977. On July 1, 1977, the unpaid balance on the Birds loans was $19,428,000. In November 1977, EAB established a special allocation of the loan loss reserve of $2,500,000. EAB obtained a tax deduction in the amount of $2,500,000 for a bad debt. That deduction was allowed by defendant.

Total accruals of interest on the Birds loans during the period 1974–80 were:

| | |
|---|---|
| 1974 | $ 988,600 |
| 1975 | 1,474,281 |
| 1976 | 1,383,650 |
| 1977 (6/30) | 624,054 |
| 1977 (12/31) | 688,936 |
| 1978 | 1,688,783 |
| 1979 | 2,422,456 |
| 1980 | 3,206,386 |

Total cash received from the Birds production payment loans from 1974 through 1980 was:

| | |
|---|---|
| 1974 | $ 627,488 |
| 1975 | 1,713,288 |
| 1976 | 1,648,254 |
| 1977 (6/30) | 822,647 |
| 1977 (12/31) | 814,700 |
| 1978 | 1,518,219 |
| 1979 | 1,498,741 |
| 1980 | 1,847,849 |

In addition to the payments on the Birds loans, Amoco paid to EAB an ongoing fee of approximately 3/8% on the outstanding balance. In an April 5, 1988, memorandum, Amoco stated this payment was in order to "compensate the bank for revenue it lost to farmout wells" drilled in 1981 and 1982. Amoco previously had reimbursed EAB for this lost revenue through the maintenance of compensating balances, but in July 1987, an informal agreement was reached to pay the extra 3/8% instead.

The following table shows the Birds loans balance, as of December 31, from 1974 to 1979, reflecting $2.5 million charge off in 1977 and interest accrual during entire period:

| Loans Balance Year (December 31) | (000 omitted) |
|---|---|
| 1974 | $20,064 |
| 1975 | $19,956 |
| 1976 | $19,744 |
| 1977 | $16,791* |
| 1978 | $16,812* |
| 1979 | $17,969* |

* reflects $2.5 million charge off in 1977.

From 1974 to 1982, dedicated revenues from the production payments were insufficient to pay all the interest and principal. The unpaid principal balance increased to $23,500,999, due to the addition of $3,776,-000 capitalized interest. After 1983, dedicated revenues were sufficient to pay all interest, and to reduce the outstanding principal to a balance of $8,900,000, as of February 29, 1988. The following chart, based on Amoco's summary, shows the history of the payments on the Birds loans during the period 1982 through September 30, 1987:

### West Whitebead Production Payments

| Year | Principal (000 omitted) | Interest (000 omitted) |
|---|---|---|
| Pre–1982 | 1,098 | 11,561 |
| 1982 | 79 | 3,114 |
| 1983 | 4,829 | 1,741 |
| 1984 | 3,115 | 2,005 |
| 1985 | 2,042 | 1,182 |
| 1986 | 1,488 | 1,070 |
| 1987 (through 9/30) | 1,093 | 517 |
| Total | $13,744 | $21,190 |
| Principal Balance (1/1/82) | $23,526 | (Includes $3,776,000 capitalized interest) |
| Principal Balance (9/30/87) | $ 9,782 | |

On April 5, 1988, Amoco's production profiles indicated production revenues would pay off fully the Birds loans by 1992 or 1993, based on an outstanding principal balance of $8,800,000 as of March 31, 1988. If production were 50% of the amounts forecast, the loans would still pay off in 1999 under the lower price estimates. Amoco concluded that the likelihood of the loan never being repaid appeared to be "quite low."

On April 25, 1988, Amoco paid to EAB $6,561,810.06 as full payment and satisfaction of all principal, interest and other charges on the Birds loans. At that time total principal and accrued interest were $8,996,773.82. The transaction included a $2,249,193.46 discount to Amoco. In 1988, EAB reported in income the full amount received.

In 1974, 1975, 1976 and through June 30, 1977, EAB applied all money received on the Birds loans to interest, either current or capitalized. From July 1, 1977, through the tax years in issue, EAB applied all cash receipts first to principal. The terms of the contracts concerning the application of payments were not altered or modified by agreement of the parties.

For the taxable years 1974 through 1976, EAB, an accrual method taxpayer, reported as taxable income the interest that was due during those years. For taxable year 1977, EAB reported as taxable income the interest that was due through June 30th. For the remainder of the taxable year 1977 and for taxable years 1978 and 1979, EAB reported none of the interest due on the Birds loans as income. The first amended complaint, filed January 21, 1988, states that on audit of EAB's 1976-79 tax returns, the IRS proposed to include the following amounts as accrued interest on the Birds loans, in EAB's interest income:

| | |
|---|---|
| 1977 | $ 688,000 |
| 1978 | $1,709,000 |
| 1979 | $2,457,000 |
| TOTAL | $4,854,000 |

The second amended complaint filed November 20, 1989, states EAB erroneously included in its interest income accrued interest on the Birds loans in the following amounts:

| | |
|---|---|
| 19876 | $1,432,773 |
| 1977 (1st half) | 620,384 |
| TOTAL | $2,053,157 |

In 1988 and 1989, EAB filed amended U.S. corporation income tax returns for the tax years 1976 through 1979; the returns included claims for a refund of income tax paid for 1976 through 1979 on the interest income related to the Birds loans. The amended returns alleged that "payments" made toward those loans in 1976 and to July 1977 were erroneously included by EAB as "interest income", or that the IRS audit examination adjustments for July—December 1977, 1978 and 1979 erroneously included "payments" made toward the Amoco loan as "interest income."

II.

Procedurally, EAB's claim on the Birds loans issue is unusual and complex. Development and assertion of the claim arose in a negotiating context, as distinguished from the usual refund claim made after taxes have been paid. When the complaint was filed on March 15, 1982, the case involved only the FNB transaction and refund claims that had been filed in June and July 1981, applicable to tax years 1973-79.

Amended returns to the IRS, dated January 15, 1988, apply to the period July 1977 —December 1979, and are stated to be based upon EAB's understanding that "one of the proposed audit examination adjustments of the Internal Revenue Service * * * erroneously includes as interest income payments made toward the Amoco loan." A refund was claimed on the ground that the erroneous IRS audit adjustment should be reversed. On January 21, 1988, EAB amended its complaint to include the Birds loans transactions and gave notice that "If the interest issue cannot be resolved administratively, it may become necessary at some future date for the court to resolve this issue in the context of this proceeding."

At the time EAB's refund claims for the July 1977—December 1979 period were made, and when the first amended complaint was filed, EAB as of September 30, 1987, had been paid $13,744,000 on principal, plus $21,190,000 in interest. As of February 29, 1988, the outstanding principal balance was $8,900,000, and EAB then was negotiating with Amoco to retire the debt for possibly $2 million less than the outstanding balance.

EAB did not amend its income tax returns to claim refunds for the period January 1976—July 1977 on the Birds loans issue until November 17, 1989. In those amended returns, EAB sought a refund of taxes "previously paid on the ground that this erroneous interest inclusion should be reversed." On November 20, 1989, EAB amended its complaint to include a claim for refund for the January 1976—July 1977 period. At the time the second amended complaint was filed, the Birds loans trans-

actions had been completed and EAB had been paid more than $42,190,000.

Negotiations on the Birds loans issue involved both the IRS and the Department of Justice. The negotiations with the IRS were concerned with the accounting treatment that applied to payments on the Birds loans. The negotiations with the Department of Justice, in addition to EAB's accounting for the loan payments, were concerned with settlement of the FNB issue. The parties, as part of the FNB settlement, have agreed to make an adjustment that is to be calculated on the basis of a decision on the Birds loans issue.

In its negotiations with the IRS and the Department of Justice, and in this litigation, EAB's position essentially is that the income tax law permits a taxpayer to amend in 1988 and 1989 its returns for tax years 1976–79 on the basis of factual assumptions that are known to be erroneous at the time the amendments were made. When it made its claims for refund or for correction of the IRS audit, and when it amended its complaint, EAB knew the assumptions as to recoverable reserves, which it argues is the basis for its July 1977 decision to place the Birds loans on a cost recovery basis, had been shown in fact to be unsound.

The tax years in dispute are 1976–79. The Birds loans issue is to be resolved upon facts and conditions in existence at the end of each tax year, and not by hindsight. Whether EAB is entitled as of July 1977 to credit to principal the payments received, and to discontinue accruals of interest income, is to be determined on the basis of knowledge present during the taxable years in dispute, without the benefit of subsequent events.[1] Subsequent events, however, are not totally irrelevant in a situation such as this. They are useful in an examination of the soundness of EAB's

judgment in its consideration of the factors that apply to non-recourse energy loans.[2]

■ The narrow issue in this case is whether EAB's decision to discontinue accruals of interest in July 1977, on the ground that there was not a reasonable expectancy that its Birds loans would ever be paid, was proper under the Internal Revenue Code (IRC), IRS regulations and applicable decisions. The law applicable to this issue is relatively straightforward.

Interest is an item the IRC includes in its definition of gross income.[3] Any item of gross income is to be included in the gross income for the taxable year in which received by the taxpayer, unless, under the method of accounting used in computing taxable income, such amount is to be properly accounted for as of a different period.[4] Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes its income in keeping its books, and the accrual method of accounting is a permissible method to compute taxable income.[5] If the method used by the taxpayer does not clearly reflect income, the computation of taxable income shall be made under a method that, in the opinion of the Secretary, does clearly reflect income.[6]

■ Under an accrual method of accounting, income is includable in gross income when all the events have occurred which fix the right to receive such income and the amount thereof can be determined with reasonable accuracy.[7] The two-prong "all events" test is comprised of (1) all the events occurring that fix the right to receive the income and (2) the amount thereof being determinable with reasonable accuracy. A fixed right to receive income occurs when (a) the required performance takes

1. *Minneapolis, S.P. & S.S.M.R. Co. v. United States,* 164 Ct.Cl. 226, 241 (1964).

2. *Sollitt Constr. Co. v. United States,* 1 Cl.Ct. 333, 345 (1983).

3. 26 U.S.C. § 61(a)(4) (1982). All references are to the Internal Revenue Code of 1954, as amended, unless otherwise specified.

4. 26 U.S.C. § 451(a).

5. 26 U.S.C. §§ 446(a) and 446(c)(2).

6. 26 U.S.C. § 446(b).

7. 26 C.F.R. §§ 1.451–1(a) and 1.446–1(c)(1)(ii).

place, or (b) payment is due, or (c) payment is made.[8]

■ For a taxpayer using the accrual method of accounting, it is the right to receive an item of income and not the actual receipt that determines the inclusion of the amount in gross income. When the right to receive an amount becomes fixed, the right accrues.[9]

■ The "all events" test is subject to an exception. A fixed right to a determinable amount does not require accrual if the income is uncollectible when the right to receive the income item arises.[10] Accrual of income is not required when a fixed right to receive arises if there is not a reasonable expectancy that the claim will ever be paid.[11]

■ The concept of uncollectibility, originating in a "reasonable expectancy of payment" criterion, is well established in case law.[12] The "reasonable expectancy of payment" exception is strictly construed. For accrual of income to be prevented, uncertainty as to collection must be substantial, and not simply technical in nature.[13] For this exception to accrual of income to apply, substantial evidence must be presented to establish there was no reasonable expectancy of payment.[14] Otherwise, a taxpayer could shift at will the reporting of income from one year to another.[15] If there is doubt as to collectibility, but it is not sufficient to prevent the reporting of the income, the normal manner for reflecting the doubt is through an addition to the reserve for bad debts.[16]

EAB is an accrual method taxpayer. The promissory notes and mortgage documents on the Birds loans established firm dates when payments were due and established precise amounts to be transferred on each payment. The amount due was computed against the unpaid principal balance outstanding, which included any unpaid (capitalized) interest. The loan documents provided that the payments were to be applied first to the payment of interest accrued and unpaid, then to items not relevant to this dispute, and, thereafter to principal. EAB, as holder of the promissory notes, on default in any payment of interest on the notes, or of principal, could declare the entire amount of unpaid principal and interest due and payable.

From the beginning of payments on the Birds loans in 1974, EAB classified the payments on an accrual basis, and applied the money received first to interest and the balance to principal. This practice was followed until a decision was made on June 17, 1977, to classify the Birds loans as deferred income accrual loans, effective July 1, 1977. Under this classification, in EAB's records, the payments were applied first to principal, accrual of interest income was deferred, and, if the payment was less than the amount of interest then due, the shortage was capitalized by increasing the principal account by the amount of the shortage.

There is no dispute that EAB's treatment of the payments on the Birds loans in 1974 and 1975 as accrued interest income was proper under the IRC, and in accord with the agreements of the parties to the loans. In 1974 and 1975, the payments on the

8. *Schlude v. Commissioner*, 372 U.S. 128, 83 S.Ct. 601, 9 L.Ed.2d 633 (1963).

9. *Spring City Foundry Co. v. Commissioner*, 292 U.S. 182, 184–85, 54 S.Ct. 644, 644–45, 78 L.Ed. 1200 (1934); *H. Liebes & Co. v. Commissioner*, 90 F.2d 932, 938 (9th Cir.1937).

10. *Jones Lumber Co. v. Commissioner*, 404 F.2d 764 (6th Cir.1968); Rev.Rul. 80–361, 1980–2 C.B. 164.

11. *Clifton Mfg. Co. v. Commissioner*, 137 F.2d 290, 292 (4th Cir.1943); *Georgia School–Book Depository, Inc. v. Commissioner*, 1 T.C. 463 (1943).

12. *Koehring Co. v. United States*, 421 F.2d 715, 190 Ct.Cl. 898 (1970); *H. Liebes & Co. v. Commissioner*, 90 F.2d 932.

13. See *Stephens Marine, Inc. v. Commissioner*, 430 F.2d 679 (9th Cir.1970).

14. *Jones Lumber Co. v. Commissioner*, 404 F.2d 764.

15. *Georgia School–Book Depository, Inc. v. Commissioner*, 1 T.C. 463.

16. Rev.Rul. 83–106, 1983—2 C.B. 77, 78.

individual loans were not adequate to cover the interest requirements due on each of the loans. In April 1975, past due interest rose to a total of $395,000. At that time, EAB neither declared the loans in default, nor did it increase its reserves so as to obtain a bad debt deduction for any part of the loans.

In 1976, and in the first half of 1977, EAB continued to apply the payments first to interest, to capitalize any shortage of interest due, and to apply any overage to principal. EAB now claims this accrual of interest income was in error because revised estimates in 1976 of recoverable reserves in the ground established that there remained insufficient security to assure a reasonable likelihood of repayment. EAB also claims that the revised oil reserve estimate made it reasonably clear that the value of the security was inadequate to assure a reasonable likelihood of repayment of principal during the tax years July 1977 to December 1979, and that no interest would be earned.

EAB's contentions as to the status of reserve estimates in oil production loans, and its contentions as to the significance of the reserve estimates on EAB's decisions in the Birds loans, do not accord with customary banking practice relative to non-recourse energy loans, nor do they accord with the facts involved in these loans. The revised estimates of net recoverable reserves is insufficient, on the facts of this case, to raise the reasonable expectancy of payment exception to the all events test.

EAB's loans to the Birds in 1974 was its first venture into non-recourse production payment loans. During the negotiations, EAB relied primarily on the statements by representatives of Amoco and S.O. Ind. The loan documents, drafted by Amoco's attorneys, contained the provisions and relationships that are common in ABC loan instruments.

EAB's approval of the Birds loans was based on an analysis that forecast a 10–year payout period, at an average interest rate of 10 percent, and average price per barrel of $8 and $10.75. Although EAB relied on the oil reserve estimates present-ed in the negotiations, the reserve estimates were not the sole basis, or even the primary basis, for EAB's decision to make the Birds loans. EAB wanted to establish a business relationship with S.O. Ind. and was attracted by S.O. Ind.'s announcement that it expected to spend $400 million in 1974 on the acquisition of oil producing properties in the United States.

EAB also relied on assurances that were not reflected in the loan documents that S.O. Ind. would pay an additional ⅜ of 1% against loan outstandings. This extra payment was to be in the form of interest-free compensating balances in EAB or tax payments made through EAB. Other factors in which EAB relied in making the Birds loans included verbal assurances that S.O. Ind. would guarantee the oil price would not fall below $8 per barrel, and if the West Whitebead field production was not sufficient, other reserves would be assigned to cover EAB.

In the Birds loans, EAB did not follow the guidelines generally adhered to in the banking industry for non-recourse-one-way-out-energy loans. Eight guidelines were summarized in an interoffice letter dated March 18, 1976, to EAB's senior vice president. The letter stated "the combined application of all is felt to be necessary to bring the inherent risks within acceptable limits." In the Birds loans, EAB departed substantially from this standard.

1. In as much as a non-recourse loan is secured and payable only out of the production payment, assets of neither S.O. Ind. nor Amoco supported the Birds loans. The real borrower (Amoco) did not own a controlling interest in West Whitebead, and Amoco was not the field operator. As a result, production rates and orderly development of the field were not controlled by EAB's borrower.

2. EAB did not have an in-house petroleum engineer to review the estimates of future production and never did any geology or engineering work on the data. Amoco's 1974 evaluations of the oil field were based on a reserve report that had been prepared by an independent consultant firm for one of the sellers to Amoco, to-

gether with an extrapolation of that data that Amoco engineers had made. The independent engineer's report concentrated principally on the percentage ownership of the first seller to Amoco (Ibis loan); the extrapolation extended the data to include the production payment interest that Amoco acquired in the second purchase (Heron and Rook loans).

3. In mid–1974, the West Whitebead field was not fully developed, and the production rates of the 11 producing wells had not been maintained for a sufficient length of time to determine the production characteristics of the reservoir.

4. The price of oil used to calculate projected cash flow during the life of the loan was not set at the lowest price considered possible over the time frame envisioned. A number of variables affect oil prices, and the estimates of future prices should be conservative. EAB used $10.75 and $8 as projected prices. EAB learned Citibank for many years used a $3.50 per barrel price assumption, and by March 18, 1976, was using a $6 per barrel price assumption.

In short, when EAB made the Birds loans in 1974, it embarked on a new venture that included assumption of risks that are customarily assumed by any bank that makes production payment loans. One such risk is that the estimates of recoverable reserves may be inaccurate, and actual field operations may result in an inability to retire the principal of the loan.

In 1974, the net recoverable reserves in the West Whitebead field for the Birds interests were estimated by Amoco to be 7.8 million barrels. Thereafter, Amoco interpreted the operating production data and experience with six dry holes, to reduce the estimate of net recoverable reserves, applicable to the Birds interest, as of January 1, 1976, to 2.6 million barrels.

EAB and Amoco considered the possible consequences of the lower reserve estimates and disappointing production results. EAB proposed a number of actions to assure larger payments on the Birds loans. Amoco requested, and EAB agreed, that action on EAB's proposals should be deferred pending evaluation of changes in production practices by the field operator, results of additional drilling and changes in oil pricing regulations.

Both parties recognized that many factors, in addition to the amount of estimated recoverable reserves, influenced whether or not EAB could be paid the full amount of the Birds loans and interest obligations. Both parties also recognized that action, either to change the agreements or to maintain the status quo, possibly could compromise banking relationships, and could jeopardize other non-recourse off-balance sheet obligations of S.O. Ind.

By September 1976, in EAB's accounts, past due interest on the Birds loans had been recovered and modest reductions in principal had been made. By February 28, 1977, the payments covered principal and interest, and the balance of the Birds loans had been reduced by $201,687. On March 9, 1977, interest on the loans was current.

In 1976 interest accruals on the Birds loans was $1,384,000, and EAB was paid $1,648,000. To June 30, 1977, interest accruals were $624,054 and EAB was paid $822,647. At that time, EAB had taken no action to increase its bad debt reserve or to otherwise indicate that the Birds loans were worthless, in any amount. In the accrual method of accounting, when the right to receive the amount becomes fixed, the right accrues. Nothing in the record establishes that the interest income reported as accrued in 1976 and to June 1977 did not accrue at that time.

During discussions in the first half of 1977, the parties negotiated with respect to EAB's proposals to make changes that would inject fresh funds and increase payments on the Birds loans. EAB proposed reduction in the interest rate, increase in dedication from 90% to 100%, or increase in compensating balances. Amoco's analysis included ten alternative courses of action, four of which were given serious consideration by the parties. In all four cases, EAB's ultimate before tax cash position was protected. After the discussions,

Amoco decided to continue to operate with no change in the agreement.

EAB's own analysis included recognition that payments on the Birds loans would be received as long as oil was recovered, and the period of recovery was estimated variously to extend at least to the year 2000. EAB also recognized that the geological studies of the reserves at best were estimates and were subject to inaccuracies, that over the next decade the price of oil was expected to rise, and that field production could be adjusted for delay so as to take advantage of higher prices. Because of this extreme unpredictability, EAB decided on action that would allow "latitude in the possible future recording of income" as these considerations became clearer over time.

EAB decided to transfer, effective July 1, 1977, the payments on the Birds loans from regular accrual loans to deferred interest accounts. In November 1977, an additional $2.5 million was allocated to the loan loss reserve and a bad debt tax deduction was allowed.

In 1977, when EAB changed its accounting treatment for payments from the Birds loans, and increased its reserves for a bad debt deduction, EAB recognized it ultimately probably would recover all or most of the loan principal, and would receive substantial amounts of interest. In 1977, EAB did not ascertain the Birds notes were worthless, or that it reasonably could not expect to recover, either from the production payments or from its ongoing relationship with S.O. Ind.

In 1977, the Birds had assets, the production payments, which were valuable. The Birds never became insolvent. In 1977, 1978, and 1979, the Birds tax returns reported combined assets of $19,200,000, $19,500,000 and $20,600,000. Reported taxable income, combined, was a $300 loss in 1977, a total of $5,090 in 1978, and $2,581 in 1979.

The terms of the original contracts, including the terms for application of the payments, were not altered or modified by the parties. The time payments were due, and the amount of interest due to be paid, were fixed by the agreements. When a right to receive an income item becomes fixed, for tax purposes, the income accrues. Delay or postponement of payment does not defer accrual.[17]

EAB argues that the Birds loans were in default at various times in 1976 and 1977. At no time did EAB exercise its contract rights and declare a default. Throughout the tax years in dispute EAB accepted cash payments from Amoco on the Birds loans. A fixed right to receive income occurs, in the all events test, when payment is due or when payment is made.

EAB argues formal action to declare the notes in default would have been futile because economic recovery could not be greater than 90 percent of the proceeds of production. This argument does not bear upon whether the interest income accrued. Such considerations, at best, go to whether the bank was entitled to a bad debt deduction.[18] EAB's conclusion that to declare the notes to be in default would be futile does not establish EAB had a reasonable doubt that there would be a failure to meet the financial obligations in the Birds loans.

At the time Amoco rejected EAB's proposals for injection of fresh funds to support the Birds loans, EAB decided to write-off $2.5 million. This was an assessment of the decreased value of the collateral. EAB's contention that once there has been a write-off no further interest income can accrue is not valid. The statute allows more than one bad debt write-off in appropriate circumstances.

It is possible to accrue income in a tax year, even though the debt later is found in that year to be partially worthless.[19] The requirements necessary to establish a bad debt deduction, however, are

17. *Koehring Co. v. United States,* 421 F.2d at 722.

18. *Exxon Corp. v. United States,* 785 F.2d 277 (Fed.Cir.1986).

19. *Spring City Foundry Co. v. Commissioner,* 292 U.S. at 185, 54 S.Ct. at 645.

entirely different from those necessary to accrue income.[20] EAB, as taxpayer, has the burden to demonstrate that the debt is worthless. Factors to be considered include the value of the collateral, and the financial condition of the debtor. In this case, Amoco's revised estimates of the net recoverable reserves allocable to the Birds loans, and the conduct of the parties, confirms the debt never became worthless.

## Conclusion

For the foregoing reasons, EAB is not entitled to a refund of taxes for the period 1976–June 1977, and the IRS assessment of interest income for the period July 1977–1979 is not erroneous. The facts of this case establish that EAB is not entitled to a bad debt deduction in tax years 1976, 1978,

or 1979, or to a deduction in 1977 in excess of the amount IRS has allowed.

Defendant's motion for partial summary judgment is ALLOWED. The Birds loans claim presented in the first and second amendments to the complaint is separate and distinct from other claims in the complaint, as amended. There is no just reason for delay of judgment as to the Birds loans claim. Accordingly, pursuant to RUSCC 54(b), the Clerk is directed to enter judgment to dismiss the claims presented in paragraphs 123–26 of the complaint, as amended. No costs.

**20.** *See Exxon Corp. v. United States,* 785 F.2d at 281.